THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EDDIE WHITLEY, Defendant-Appellant.

First District (4th Division)   No. 62414

Opinion filed June 2, 1977.

494

James R. Streicker and Steven H. Nardulli, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Paul Benjamin Linton, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Following a jury trial the defendant, Eddie Whitley, was found guilty of armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18—2), and was sentenced to a term of six to 30 years in the Illinois State Penitentiary. On appeal the defendant makes the following contentions: (1) he was not proven guilty beyond a reasonable doubt; (2) the trial court erred in failing to determine whether the jury had any specific questions where the foreman requested a copy of the minutes of the proceedings; (3) the hearsay testimony of a police officer that he observed the identification made by the complaining witness denied the defendant a fair trial; (4) portions of the State's closing argument were so prejudicial as to deny the defendant a fair trial.

We affirm the conviction and sentence.

The complaining witness, Mrs. Margo Coulter, testified that on February 4, 1974, between 8:15 p.m. and 8:30 p.m. she got off a bus at 69th and Normal in Chicago and walked south on Normal towards her home at 71st and Normal. About 10 feet from her front gate a man whom she identified in court as the defendant approached her from behind and told her to drop her purse. Mrs. Coulter turned and faced the man whom she described as being black, about 5 feet 10 inches tall, weighing about 155 to 165 pounds, about 19 to 22 years old, with a mustache and goatee and wearing a brown corduroy coat with fleece on the lapels. In his left hand the man held a silver plated revolver which he pointed at her right temple. He searched her coat pockets, put his hand down the front of her sweater and searched the cups of her bra, then took her purse and ran. The man was in Mrs. Coulter's presence about three to four minutes. While he searched her she looked up into his face. He was close enough to her that she could have reached out and touched him. The area was illuminated by four high intensity street lamps. The light was behind Mrs. Coulter and the man was facing her and the light. She testified that it was light enough that one could have read a paper there. Mrs. Coulter than went to her home and called the police. When the police arrived she gave them a description of the man. On February 7 Investigators Edward Brown and Carl Malik came to Mrs. Coulter's home and showed her about 200 to 250 photographs of black men, none of which she recognized. At that time she told Brown that the man who had robbed her had a mustache and goatee. About two days later she went to the police station and looked at about 400 to 500 photographs of black men, again without picking any out. On February 11 Brown and Malik came to her home and showed her 8 to 12 photographs of black men. Mrs. Coulter picked out a photograph of the defendant as the man who robbed her. When she was asked to look at the second group of 400 to 500 photographs she was getting impatient and was tired of looking at pictures. She first indicated in her testimony that the investigators told her to look very carefully at the third group of 8 to 12 photographs, but when she was asked again about this she stated that she was only told to look at the photographs. On February 21 Brown called her and asked her to go to the station and view a lineup. At this point she wanted to "hurry it and get it over with" so she agreed to go. She "assumed" the lineup was connected with the robbery. The lineup consisted of five black males whom she described as being about the same height, and general build. Each man in the lineup repeated a phrase which her robber had used. She did not recall if they gave their names. She had first used the defendant's name when she swore out an arrest warrant on February 12. Mrs. Coulter identified the defendant at the lineup from his appearance and his voice.

Investigator Edward Brown testified that on February 7, 1974, Mrs.

Coulter gave him a description of the man who had robbed her as being a male negro, approximately 19 to 21 years old, 5 feet, 10 inches in height, with a goatee and mustache and wearing a brown corduroy coat with a fur or fleece collar. On February 7 he showed her about 20 photographs but she did not identify any. On February 9 she failed to pick out any of four to five hundred photographs which he showed her. When Brown began to testify as to nine photographs shown to Mrs. Coulter on February 11, defense counsel objected to any identification corroboration testimony as being inadmissible hearsay. The court stated that such testimony would be admissible not for the purpose of proving the truth of the matter asserted, in this case Mrs. Coulter's prior identification of the defendant, but rather to establish the circumstances of the identification. However, the court refused defense counsel's request that the jury be instructed on this limited purpose, and defense counsel was then permitted to enter a standing objection to any testimony by police officers concerning Mrs. Coulter's prior identification of defendant from photographs or in a lineup. Over defense counsel's objection, Brown testified that Mrs. Coulter looked at nine color photographs on February 11 and selected that of the defendant as the man who had robbed her. Brown also testified that on February 21, 1974, he conducted a lineup in which five male negroes of approximately the same age and height were viewed by Mrs. Coulter, at which time she identified the defendant as the man who had robbed her. They were instructed to state their names but were also told that they need not give their real names, and defendant gave a name other than his own.

Defendant testified in his own behalf. He denied having robbed Mrs. Coulter and stated that he was in Detroit visiting his family on the date of the robbery, February 4. He testified that on February 1, 1974, he purchased a Greyhound bus ticket for Detroit and boarded a bus in Chicago which left for Detroit at about 11:45 p.m. that night. He arrived at his mother's home in Detroit between 4 and 5 a.m. on February 2. He stayed in Detroit until February 6. On Sunday, February 3, he saw the movie "The Exorcist." February 6 he bought a return bus ticket for Chicago, costing $9.55. The agent from whom he purchased the ticket was a white male in his middle thirties, about 5 feet 10 inches tall and weighing less than 150 pounds. Defendant produced a bus ticket receipt which he said was for the ticket he purchased February 6. When he got back to Chicago he saw his aunt, with whom he lived. Defendant stated that in the lineup he was required to state his own name, and that Mrs. Coulter, whom he had never seen before, stated that she was not sure as to his identification.

Defendant's mother, Rachel Robinson, his sister, Carolyn Whitley, and his brother, Willie Whitely, all essentially corroborated his alibi that he was in Detroit from February 2, 1974, to February 6, 1974. His mother

thought he had arrived between 4:30 and 5 a.m.; his sister thought it was between 5 and 6 a.m.; his brother thought it was between 4 and 5 a.m. His mother and sister said they had seen him every day of the visit. His brother testified that he saw "The Exorcist" with the defendant on Sunday the 3d; however, his sister recalled that defendant and his brother saw "The Exorcist" on Wednesday the 6th. She stated that their mother did not go with them to the movie. Defendant's mother recalled that she went to "the show" that Wednesday and came back to find that the defendant had left, apparently for Chicago.

Larry Pickens, defendant's friend of 10 years, testified that on February 4, 1974, he called the defendant in Detroit, from his home phone in Chicago at about 9:30 p.m. The last time he had spoken to the defendant by phone was five to six months earlier. A telephone bill was introduced which showed that on February 4, 1974, two phone calls were made from Pickens' home phone to defendant's mother's phone in Detroit. The time of the calls is not shown on the bill.

On rebuttal Allen Wittleshofer, assistant terminal manager for Greyhound in Chicago, testified that in February 1974 the fare for a bus ticket between Chicago and Detroit was $12.95, the same as that for the return trip. The last bus leaving for Detroit from Chicago on each day in February left at 11:25 p.m. and arrived in Detroit at 6:10 a.m. the next morning. Greyhound kept no passenger lists and tickets bore no passenger names. A ticket could be used by anyone for 60 days after its purchase. A code number on each ticket indicated which agent had sold that ticket.

It was stipulated between the parties that if Ulysses Pearcy were called to testify he would testify that the ticket receipt produced by the defendant, bearing code number 21 and dated February 6, 1974, was one which he had sold on that date. Mr. Pearcy would also testify that he was a male Negro of the age of 51 years, 5 feet 7 inches tall, weighing 175 pounds, wearing glasses, and having his hair in a short Afro.

Investigator Malik testified that the defendant did not give his own name at the lineup. He also testified that Mrs. Coulter identified the defendant at that lineup and never stated that she was unsure of the identification.

## I.

■■ Defendant's reasonable doubt argument is premised on his contention that the single witness identification by Mrs. Coulter was not credible enough to permit the jury to disregard defendant's alibi. Defendant cites case law to the effect that a court may not disregard the evidence of alibi where the only contradicting evidence rests upon the identity of the defendant as the man who committed the crime. (*People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434; *People v. Peck* (1934), 358

Ill. 642, 193 N.E. 609.) However, both of these cases involved alleged identifications made under very poor conditions which were countered by strong alibi testimony. Certainly in such cases alibi testimony not only cannot be disregarded but must be given considerable weight. But the general proposition stated in these cases is that a court may not totally disregard alibi testimony; not that alibi testimony must be believed over a single witness identification. The trier of fact is never required to accept alibi testimony over the positive identification of an accused, even though the alibi testimony is given by a greater number of witnesses. *People v. Jackson* (1973), 54 Ill. 2d 143, 295 N.E.2d 462.

The single witness identification in the case at bar was a strong one. Mrs. Coulter viewed the man who robbed her, face to face, for a period of three minutes under lighting conditions which she testified would have allowed her to read a newspaper. She also heard the defendant's voice. The description which she gave to the police matched that of the defendant. After viewing hundreds of photographs she positively selected that of the defendant out of a group of nine photographs of young black men. Four of those men had mustaches and goatees, two others had mustaches. She again positively selected the defendant on the basis of appearance and voice at a lineup of five young black males. This time only the defendant had a mustache and goatee, but two others had mustaches and all were of generally the same height and weight. In any event, complete exactitude of features is not required in lineup and photographic identification situations. (*People v. Lawless* (1975), 31 Ill. App. 3d 650, 334 N.E.2d 292; *People v. Bey* (1969), 42 Ill. 2d 139, 246 N.E.2d 287.) Certainly these identification procedures were not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*People v. Brown* (1972), 52 Ill. 2d 94, 99, 285 N.E.2d 1; *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) Defendant's contentions that he was required to state his own name in the lineup and that Mrs. Coulter was not certain of her identification of him were both countered by convincing State testimony which the jury clearly believed.

■■ Nor was defendant's alibi completely uncontradicted, as he suggests. His family generally agreed with him on an arrival time which the State established was an hour or two before the scheduled arrival time of the bus he claimed to have ridden. The testimony was contradictory on when defendant saw a movie he claimed to have seen in Detroit, and even as to whether he saw it at all. Defendant's clear description of the man who allegedly sold him his return bus ticket was contradicted in every detail by the stipulated testimony of the man who sold the ticket for which defendant produced a receipt. The testimony concerning the telephone call clearly established only that a call was made from the home of defendant's friend to that of defendant's family on the night of

the robbery. The documentary evidence did not establish who made the call. Nor was the jury required to believe the testimony of defendant's friend, who had not called defendant prior to that night for at least five or six months. None of this testimony was by unbiased witnesses; it was by the defendant, his family, and his friend. The jury could properly have taken that fact into consideration along with the contradictions detailed above. Their determination of the relative credibility of the witnesses was not against the manifest weight of the evidence and will not be disturbed by this court.

## II.

■■ Defendant next contends that the trial court erred in failing to exercise its discretion to consider whether to comply with the jury's query on the availability of a transcript of the proceedings.

After a period of deliberation the jury was returned to the courtroom at which time the foreman indicated that there was a "hung" jury. The court responded that they could not have a hung jury at that time and that they should return to the jury room and continue deliberation. The following colloquy then took place:

> "THE FOREMAN: Would the minutes of this hearing be available to us?
>
> THE COURT: The court reporter had [*sic*] not had an opportunity to type everything up, so we do not have a transcript.
>
> THE FOREMAN: Fine.
>
> THE COURT: We do not. I am sorry that we do not, but we do not have it.
>
> THE FOREMAN: Thank you."

Defendant never objected to this reply to the request. He did not allege this as a ground for a new trial in his written post-trial motion, nor did he mention it in his oral argument on that motion. This clearly is an instance where the waiver doctrine is properly invoked. Defendant cannot acquiesce to a response which his timely objection might well have altered, fail to allege this as error in his post-trial motion for a new trial, and then claim error for the first time before this court. *People v. Irwin* (1965), 32 Ill. 2d 441, 207 N.E.2d 76.

Quite apart from the issue of waiver, we do note that the record does not reflect a failure by the trial court to exercise discretion in this matter. The trial judge did not indicate that he lacked the authority to honor the request as was the case in the two Illinois Supreme Court cases which found a failure to exercise discretion. (*People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166; *People v. Autman* (1974), 58 Ill. 2d 171, 317 N.E.2d 570.) It is true that in *People v. Jackson* (1975), 26 Ill. App. 3d 618, 325 N.E.2d 450, this court found that the trial court's failure to make a preliminary determination of which testimony the jurors desired to

review, following a general request for a transcript, supported a finding that the judge erroneously believed he had no discretion to furnish such testimony. However, there was no indication in that case as to whether defendant acquiesced in the court's reply, as occurred in the case before us. Nor does that opinion indicate what the judge's precise response was. In the matter before us the trial judge apologetically cited the lack of availability of a transcript as a reason for not furnishing one to the jury. This implies recognition by the judge that he did have the discretionary authority to furnish such a transcript. We also note that several courts have recognized that considerations of time and accuracy are a factor to be considered, especially in Cook County where several court reporters may have been used for one trial and may not be immediately available at the time of the request. *People v. Farley* (1976), 37 Ill. App. 3d 178, 345 N.E.2d 724; *People v. Page* (1976), 39 Ill. App. 3d 728, 350 N.E.2d 262.

### III.

■■ Over defendant's objection the trial court permitted Investigator Brown to testify as to Mrs. Coulter's identification of the defendant from photographs and a lineup. Defendant argues that this was prejudicial error.

In allowing this testimony the court indicated that it was being admitted only to establish the circumstances of the identification; however, the jury was not instructed as to this limited purpose despite defendant's request that this be done. The State has correctly noted that defendant failed to specify this alleged error in his written motion for a new trial, a failure which would permit us to consider the issue waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) However, we note that the central purpose of this waiver doctrine is to enable the reviewing court to have the benefit of the trial court's judgment. (*People v. Irwin* (1965), 32 Ill. 2d 441, 207 N.E.2d 76.) Thus, when the matter has in some manner been brought to the attention of the trial court, as it was here by defendant's objection at trial, the reviewing court may, in its discretion, consider the issue on its merits. (*People v. Nunez* (1974), 24 Ill. App. 3d 163, 320 N.E.2d 462.) We will, therefore, consider this allegation of error on its merits.

■■ Investigator Brown's testimony only repeated the clear and convincing testimony as to the identification by the one who made the identification, Mrs. Coulter. Where, as in the case at bar, the hearsay testimony is only cumulative in that it is supported by the positive identification testimony of the person who made the identification, the admission of the hearsay has been held to be harmless error. (*People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133; *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364; *People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.) There is also a developing line of authority for

the proposition that no violation of the rule against hearsay is involved in such cases because the purpose of the rule is satisfied by the availabilty of the declarant, the person who made the identification, for cross-examination. (*People v. Keller* (1970), 128 Ill. App. 2d 401, 263 N.E.2d 127; *People v. Mitchell* (1975), 34 Ill. App. 3d 311, 340 N.E.2d 226; *People v. Ward* (1976), 37 Ill. App. 3d 960, 347 N.E.2d 381; *contra,* 1974 U. Ill. L.F. 675, 679.) Clearly, then, the admission of Brown's corroborative testimony was either harmless error or no error at all given the positive identification testimony by Mrs. Coulter.

## IV.

■■ Finally, defendant has alleged that comments by the prosecutors in their closing arguments were so prejudicial, individually or cumulatively, as to have denied defendant his right to a fair trial. Apparently some of these alleged errors were not specified in defendant's motion for a new trial. However, because defendant did timely object to all of the five alleged areas of improper comment, thus bringing them to the attention of the trial court, we will consider them under the principles enunciated earlier in the opinion. We also note that we may consider these alleged errors under the plain error rule. Ill. Rev. Stat. 1975, ch. 110A, par. 615(a).

In his closing argument the prosecutor commented on the fact that defendant had chosen to put on a defense, suggesting that he did so because "* * * he was confronted with the evidence." Later the prosecutor again commented on the fact of defendant's choice to put on a defense, stating: "He didn't have to say anything, but he did. And why did he say it? Because they knew that she had him dead cold, a dead thing armed robbery." Defendant cites the case of *People v. Weinstein* (1966), 35 Ill. 2d 467; 220 N.E.2d 432, in which the court held that it was prejudicial error for the prosecutor to repeatedly state that defendant had the burden to present evidence creating reasonable doubt. But the prosecutor's statements at issue here were directly invited by defendant's closing argument in which he, too, referred to the fact that defendant had chosen to testify and to present a defense. The defendant's counsel told the jury that defendant did this because he wanted the jury to know the truth. In this context, it is clear that the prosecutor's comments were not intended to shift the burden of proof to the defendant, nor could they reasonably have had that effect since both the prosecution and the defense told the jury that the State had the burden of proof. The prosecutor's comments having been invited by those of the defendant's counsel, he cannot now claim that those invited comments were prejudicial. *People v. Bey* (1972), 51 Ill. 2d 262, 281 N.E.2d 638; *People v. Carruthers* (1974), 18 Ill. App. 3d 255, 309 N.E.2d 659.

Defendant also complains of the prosecutor's suggestion during closing

argument that the reason defendant's family testified for him was that they had an opportunity to do something for him after 19 years in which he hadn't lived with them, further stating: "Had they shown him the same concern over the last nineteen years as to his wellbeing, whether or not he was on the streets, they wouldn't have had to come to Court." Defendant suggests that this argument prejudiced defendant in the eyes of the jury by pointing out his "bad family background and general bad character." The comment does suggest that defendant had a bad family background, but we fail to find any clear prejudicial effect from this comment. Indeed, it is quite possible that such a background would invoke sympathy for the defendant. The fact that defendant had not lived with his family for 19 years was in evidence. As noted above, defendant's counsel had already suggested reasons for defendant and his family to testify. To that extent the prosecutor's comment was invited. We find no prejudicial error resulting from the remarks.

The prosecutor also commented on the failure of defendant to call his aunt as an alibi witness, stating: "Reasonable inferences, ladies and gentlemen. Why didn't he call his aunt, whom he lives with on the south side. She didn't come in here to testify he came home on the 6th." These remarks were improper and the trial court erred in overruling defendant's objection to them. Such comment tends to unfairly shift the burden of proof to the defendant and is permissible only where a defendant has injected such witnesses into his defense and where the witnesses are uniquely accessible to the defendant. *People v. Munday* (1917), 280 Ill. 32, 117 N.E. 286; *People v. Williams* (1968), 40 Ill. 2d 522, 240 N.E.2d 645, *cert. denied* (1969), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004; *People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170.

It is not even clear that defendant's aunt could have been an alibi witness. Defendant testified that he saw her when he returned to Chicago on February 6, but there was no evidence that she could have testified to where he was on the date of the robbery or where he had been when he saw her on the 6th. Furthermore, there was no showing that she was not equally accessible to the State as a witness.

■■ Nonetheless, we consider such error to be harmless. The jury heard the evidence indicating the aunt's mere peripheral involvement in defendant's alibi. They must have been aware that the crucial testimony was that of defendant and the family members who allegedly saw him in Detroit on the date of the robbery. We have already noted that both defendant and the prosecutors informed the jury that defendant was not required to put on a defense, that the State had the burden of proof. Therefore, we conclude that the erroneous admission of this brief comment on defendant's failure to call a peripheral alibi witness, where defendant had called a number of other alibi witnesses, could not have

prejudiced the defendant or misled the jury as to the burden of proof in the case.

██ Again during closing argument the prosecutor commented on the purse taken from the complainant:

"PROSECUTOR: The purse is similar to the purse that Mrs. Murphy has been carrying around for the last three days. It is a shoulder purse. The purse is similar to the purse that Mrs. Murphy has had for the last three days. The purse is similar to the purse that Mrs. Murphy brings into chambers every time we have a side bar, and won't leave it out here with him sitting there * * *.

MR. NUDELMAN: Objection, Your Honor.

PROSECUTOR: (Continuing) * * * while you fourteen people are watching.

MR. NUDELMAN: Objection, Your Honor.

THE COURT: Overruled.

PROSECUTOR: Can it be that she won't trust him in the presence of her own purse?

MR. NUDELMAN: Objection, Your Honor, again.

THE COURT: Objection sustained so far as that is concerned."

The State concedes that these comments were improper. We agree they were grossly improper. They were certainly not founded on the evidence, and can only be construed as an attempt on the part of the prosecutor to prejudice and mislead the jury and as such they are to be condemned. However, the issue before us is whether such comments could have prejudiced the defendant and deprived him of a fair trial. It is common knowledge that women make a practice of carrying their purses with them as they move about. It is doubtful that the prosecutor's attempt to use the fact that one of defendant's attorneys followed such a practice as evidence of a mistrust by her of the defendant was successful. Therefore, while we condemn these comments by the prosecutor, we do not find that they could have prejudiced the defendant's right to a fair trial. The comment was an isolated one, an objection to it was ultimately sustained, and it was unlikely to have had an effect on the jury.

The final comments to which defendant has attributed reversible error were gross misstatements by the prosecutor concerning the nature and effect of defendant's stipulation as to what the testimony of the ticket agent who apparently sold the ticket to defendant in Detroit would be:

"Now the defendant says—and who can believe him because the stipulated—

MS. MURPHY: Objection.

PROSECUTOR: (continuing)—because they stipulated, they stipulated that he lied.

MS. MURPHY: Objection, Your Honor. There is no such stipulation.

THE COURT: Overruled.

PROSECUTOR: You decide, ladies and gentlemen. He testified that he took the bus from Detroit back. He said a white man sold him his ticket, oh, he is thirty-five to thirty-seven, about one hundred and thirty-five or a hundred and forty pounds, a little bit shorter than me. They stipulated. That is an agreement between the State and their defense, on his behalf. They stipulated that the man is fifty-one years old, a negro, a black man, with a medium Afro, wearing glasses, about five feet seven and weighing one hundred and thirty pounds. They stipulated that when he opened his mouth on that stand he told a bold-faced lie.

MR. NUDELMAN: Objection, Your Honor.

MS. MURPHY: Objection, Your Honor. That is not the stipulation.

THE COURT: The jury heard the evidence. Overruled.

PROSECUTOR: Thank you, Judge.

THE COURT: The defense did not stipulate that he lied. Proceed.

PROSECUTOR: In effect they stipulated—

MR. NUDELMAN: Objection, Your Honor. It is the same thing. He is just repeating himself again for the fifth time.

THE COURT: Proceed, Mr. Pierce.

PROSECUTOR: Thank you, Judge."

The State concedes this argument to be error but labels it harmless.

■■ We again emphasize our condemnation of the comments of the prosecutor. Such comments could not have been honest mistakes in interpretation of evidence. As stated in the ABA standard relating to the prosecution function: "(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it might draw." (ABA Standards, The Prosecution Function §5.8 (1974).) While the prosecutor's comments should have been immediately stricken by the trial judge, he did ultimately instruct the jury that the stipulation was not that defendant had lied. In his closing argument defendant's counsel admitted that defendant had been mistaken in his identification of the ticket seller, yet he reaffirmed his belief that defendant was telling the truth as to his alibi. In the light of these comments it is unlikely that the jury was misled as to the effect of the stipulation. The real damage to the defendant from the stipulation was in its contradiction of the details of part of his alibi; damage which was

unaffected by the prosecution's improper statements. We find that this was harmless error.

■■ We have identified a number of comments by the prosecutor which we have found to be individually harmless, though we strongly disapproved of their use by the prosecution. It is true that a cumulation of errors may require reversal even though individually they would not be reversible. (*People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297.) Defendant has cited the case of *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880, in which despite what the court described as "considerable evidence" against the defendant, his conviction was reversed on the basis of a number of comments by the prosecutor which the appellate court had condemned but not found to be reversible. We note that the court in *Weathers* also stated that "[e]ach case of this kind must be decided upon its own facts." (62 Ill. 2d 114, 120.) In *Weathers* the prosecutor charged the defendant and his attorneys with lying; he told the jury that the defendant was a habitual criminal who had not been caught before because he was too smart; he stated that defendant presented a defense because he and his attorneys knew that he had been proven guilty beyond a reasonable doubt; finally he told the jury that the trial judge knew the defendant had committed the armed robbery for which he was being tried. In the case before us we have not found errors of such obviously prejudicial effect. We again emphasize the distinction we make between condemnation of errors because of the manner and intent with which they were made, and a finding that those errors could in fact have prejudiced defendant's right to a fair trial. The identification testimony of the complaining witness was strong and unimpeached. Defendant's alibi defense was corroborated only by witnesses with an obvious interest in his defense and was contradicted as to significant details. When we examine the comments to which defendant has objected, and their possible effect on the manner in which the jury viewed the evidence and judged the credibility of witnesses, we cannot say that those errors were a material factor in defendant's conviction, or that the verdict would have differed had the comments not been made. *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771, *cert. denied* (1970), 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578.

The judgment of the trial court is affirmed.

DIERINGER, P. J., and LINN, J., concur.