THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL BONDS, Defendant-Appellant.

First District (4th Division)    No. 79-835

Opinion filed August 21, 1980.

James J. Doherty, Public Defender, of Chicago (Kathleen O'Donovan and Ira Churgin, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Edwin Bishop, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendant, Michael Bonds, age 19, was indicted for the offenses of armed robbery and armed violence. After a jury trial he was found guilty of three counts of armed robbery and sentenced to a term of 14 years' imprisonment in the Illinois State Penitentiary. He appeals, contending:

(1) the defendant was not proven guilty beyond a reasonable doubt as the identification testimony of the State's main witness was contradictory, doubtful and unconvincing;

(2) the defendant was denied a fair trial since the principal witness' testimony was improperly bolstered by the admission of hearsay evidence;

(3) the court committed reversible error in giving the *Prim* instruction (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731), to the venire;

(4) the sentence is excessive.

We find no error and affirm.

The judge made several comments to the venire prior to the selection of the jury. He introduced the parties involved in the trial to the prospective jurors, and informed them of the charges pending against defendant. The judge explained the functions and duties of the jury, informed them of their duty to be fair and impartial in reaching a verdict. He also stated the jury's verdict must be unanimous, that the jurors had a duty to consult with one another and to deliberate with a view toward reaching an agreement, that each juror must decide the case for himself after an impartial consideration of all the facts with fellow jurors. The jurors also were instructed they should not hesitate to reexamine their views and change their opinion if convinced it was erroneous; they were not under any circumstances to surrender an honest conviction as to the weight or the effect of the evidence solely because of the opinion of fellow jurors, or merely to return a verdict.

At trial, Bealy Reynolds, one of the victims, testified that he left the First Lady Disco Lounge at approximately 5 a.m., August 19, 1978. Outside the lounge he met Michael Bonds, whom he identified in court as the defendant, and a woman named Thelma. He had never seen either before. Bonds was wearing burgundy colored pants and a matching vest. The lighting conditions were good.

The three walked to the home of David Johnson and Emma Smiley where Bealy was staying. During the 10-minute walk, they passed a number of street lights. After the three reached the residence, Bealy went inside and got some money from David Johnson. He then returned to the others. Bonds asked if he could use the washroom before they left. Bealy opened the door, walked into the dining room, pointed down the hallway and told Bonds where the washroom was located. Bealy then returned to the porch and began to talk to Thelma for three to five minutes, after which he went to check on Bonds. He went into the house. Just as he stepped into the living room an unknown male voice told him to lie down on the floor. He obeyed and lay face down on the dining room floor in front of Johnson's bedroom. As he lay on the floor he heard the defendant, whose voice he recognized, tell Emma to shut up and tell David to give him the keys to the car. Bealy could see the speaker's trousers and shoes. He was wearing the same trousers Bealy had earlier observed on Bonds.

After this a man who had had his foot on Bealy's head told a young lady who was accompanying them to "take this and watch him." She then put her foot on the back of Bealy's neck and forced his face flat down (before his head had been facing towards the bedroom). Bealy then heard Bonds say, "Okay, we have got enough, we have got enough, Mickey, let's go." As the woman took her foot off the back of Bealy's head, Bonds came out of the bedroom and walked past Bealy. Again Bealy could see the trousers—they were the same ones Bonds had been wearing outside the lounge.

Bonds told everyone not to move and then fired a shot into the floor about three feet from where Bealy was lying. The bullet was later found in the basement.

The next time Bealy saw Bonds was at the police station when he identified him in a lineup.

Bealy testified on cross-examination that he did not see and could not describe the man who grabbed him. Moreover, he could not identify the female voice as belonging to Thelma. But he reiterated that he recognized Bonds' voice, clothing and shoes. Bealy also admitted that he was subpoenaed to testify and was arrested and brought by the police to testify. On redirect examination he explained that he had not known of the subpoena.

David Johnson testified that he had been asleep in bed with Emma Smiley, his common-law wife, when Bealy came in about 5 a.m. to get $20. A few minutes later David heard rubbing on the side of the wall. He looked up and saw a man standing with one hand against the wall and a gun in the other. The man was wearing a dark suit with an open vest and no shirt.

The man ordered David to lie face down on the floor and asked "where is the money." David told him it was in his pants' pocket. David heard the man go through his pockets. David then heard Bealy come into

the house and say "what is going on." Another voice said, "It's a stick up, get on the floor." David heard Bealy when he got on the floor. He said "take your foot out of my back."

David then heard someone go through the bedroom closet. A man asked him if he had a gun and where it was. He told them it was in the closet. The man took both a gun and a sword from the closet. David heard the man cock the gun.

One of the men asked David if he had a car. He said it was a 1975 Oldsmobile, yellow with black top. The license plate of the vehicle was VE 3032. The man asked David to identify the car keys from others on the key ring; and told David he had better make sure it was the right key and if it was not David was dead. David did so. He then heard someone leave the house and start the car which was parked directly in front of the house. Then the rest of them left the house. One said "don't anybody move." A shot was fired in the dining room.

David got up after hearing the man run out of the house and down the steps. He locked the front door. As he went to the door he observed Bealy lying on the dining room floor with his head in the bedroom doorway. When he locked the door, he saw that his car was gone. When he next saw his car it had been wrecked.

David called the police. He then checked the bedroom closet and discovered several articles were missing.

David further testified that there were two entrances to his home, a front door and a rear door. He stated that the rear door was locked before he went to bed and it was still locked when he checked it in the early morning hours of August 19, 1978.

David testified that during the incident there were three voices he did not recognize, two male and one female. He was unable to give any descriptions of the intruders to the police. He did, however, identify photographs of the automobile driven by Bonds when arrested as photographs of his car. The license number of the car driven by Bonds when arrested was VE 3032.

Emma Smiley testified that she was lying on her back during the entire incident pretending to be asleep. She did not recognize any of the voices and never opened her eyes.

On August 19, 1978, at approximately 5:15 a.m., Chicago Police Officer Ida Height and her partner went to 5149 S. Aberdeen in response to a radio assignment of a home invasion and armed robbery. The officers spoke with a sergeant and a lieutenant who were present and to Bealy Reynolds and David Johnson. Bealy told Height that the male Negro and female Negro he met at the lounge committed the robbery and gave her a general description of the two. Bealy did not mention that he could

recognize the voice and pants of defendant. The officer stated she did not ask Bealy if he recognized the offenders. The officer stated the report prepared by her was a summary of what happened and did not contain, word for word, everything that was said in her interview with Bealy.

Chicago Police Sergeant Edward Choate was on duty, in uniform, and driving a marked squad car on August 19, 1978, at approximately 8:45 a.m., less than four hours after the robbery occurred, when he observed a black over yellow Oldsmobile "98" approximately 50 feet in front of him. Both that vehicle and his own were traveling at about 30 miles per hour. Choate saw the driver of the Oldsmobile look into his rear view mirror. The car then accelerated first to 40 or 45 miles per hour and then to 50 to 60 miles per hour. Choate then activated his blue mars light and started to follow him. He did not have the mars light on before the driver increased his speed. Choate also put in a call that he was chasing a speeding vehicle and gave its direction and description.

During the chase Choate saw the face of the driver of the Oldsmobile. It was Bonds.

Choate followed the car to an alley where he lost sight of it. Five or ten seconds later, he saw the car leave the alley and hit a bread truck on 69th Street. Another police car followed the Oldsmobile out of the alley. The Oldsmobile then proceeded east on 69th Street through a red light.

Chicago Police Officer Raymond Hutton testified that he was on routine patrol at 8:15 a.m. on August 19, 1978, when he received a call of a chase. He went west on 68th Street and saw a black over yellow 1975 Oldsmobile come speeding from an alley. He could see the driver of the car and identified him as Bonds. At this time Hutton did not have his mars light on. The driver of the Oldsmobile looked "right at" Hutton then "took off" in a big cloud of dirt through an alley. Hutton activated his mars light and followed. Hutton estimated that the Oldsmobile was traveling at between 60 to 70 miles per hour through the alley. The speed limit was 20 miles per hour. Bonds attempted to make a turn at 69th Street, lost control of the car and struck a bread truck. Hutton got out of his squad car. Bonds accelerated and passed the officer at a high rate of speed. Hutton jumped back and fired two shots, one at the front tire and one at the rear tire. He hit the left front tire. Bonds then drove east through a red light and turned onto Laflin Street.

Hutton returned to his squad car and learned that the Oldsmobile had been abandoned on Laflin. He drove toward the address and saw a man running. He could not recognize his face very well but recognized the vest as belonging to Bonds. After a foot chase Hutton, assisted by other officers, arrested Bonds. No weapons or property were found on his person.

Bonds offered no witnesses in his behalf. After deliberation, the jury

found Bonds guilty of three counts of armed robbery. The judge, after considering such matters as the fact that this was Bonds' fourth crime, and his taking off at a high speed, thus endangering innocent lives, sentenced the defendant to 14 years in the penitentiary.

I.

■■ The defendant's contention that the evidence did not establish his guilt beyond a reasonable doubt is without merit. Bealy testified that he had recognized Bonds, whom he had met earlier that evening, as one of the robbers, by his voice and the clothing he was wearing. It is well established that the identification testimony of a single witness is sufficient to convict if the identification is positive and the witness found to be credible. (*People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318; *People v. Tate* (1978), 64 Ill. App. 3d 1, 380 N.E.2d 976, *appeal denied* (1978), 71 Ill. 2d 620.) And identification by voice is a recognized and proper method of identifying a defendant. *People v. Bradley* (1973), 12 Ill. App. 3d 783, 299 N.E.2d 99.

■■ Furthermore, Bealy's testimony does not stand alone but was corroborated by other evidence. First the defendant, only 3½ hours after the robbery, was driving the stolen vehicle. This "recent, exclusive and unexplained possession of stolen property by defendant in and of itself gives rise to an inference of guilt, which may be sufficient to sustain a conviction for armed robbery in the absence of facts and circumstances which leave in the mind of the trier of fact a reasonable doubt of guilt." *People v. Bullock* (1977), 51 Ill. App. 3d 149, 153, 366 N.E.2d 475, 478.

Here Bonds presented no such facts and circumstances. In addition, Bonds fled when he first saw Sergeant Choate, although at that time Sergeant Choate was not pursuing him. Such flight is additional circumstantial evidence of Bonds' guilt. *People v. Watson* (1975), 28 Ill. App. 3d 786, 329 N.E.2d 512.

*People v. Reed* (1968), 103 Ill. App. 2d 342, 243 N.E.2d 628, and *People v. Charleston* (1970), 47 Ill. 2d 19, 264 N.E.2d 199, relied on by Bonds, are not in point. In *Reed*, the victim unlike here, had not met the defendant until the moment of the crime and, again, unlike here, the principal identification of the defendant was by means of a dark coat. In *Charleston*, although the witness had gone to school with her assailant, she failed to tell the police that she knew him. As the supreme court remarked, the witness' behavior in concealing the identity of her assailant for almost a week was highly unusual. In the instant case, while Bealy admittedly failed to tell the police officer that he had recognized Bonds by his voice and clothing since she did not ask him how he recognized Bonds, he did tell her that he recognized the robber and that it was the man he had met earlier in the evening.

## II.

Bonds next contends that he was denied a fair trial because Bealy's testimony was improperly bolstered by the admission of hearsay evidence, namely, David's testimony that he heard Bealy say "Get your foot out of my back."

Hearsay evidence has been defined as testimony in court, or written evidence, of a statement made out-of-court, the statement being offered as an assertion to show the truth of the matters asserted therein, and resting for its value upon the credibility of the out-of-court asserter. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) The hearsay rule does not encompass extrajudicial statements which are not offered for the purpose of proving the truth of the matters asserted in the statements. (*People v. Devine* (1977), 55 Ill. App. 3d 576, 371 N.E.2d 22, *appeal denied* (1978), 71 Ill. 2d 603.) The State has asserted, in the trial court and on appeal, that the statement at issue was not introduced to establish the truth of what was asserted. However we find no other reasonable purpose for the introduction of the statement, nor has the State suggested any. Subsequent to this testimony Bealy testified that during the course of the robbery a woman held him down by placing her foot on the back of his neck. Clearly the State had anticipated this testimony and sought to corroborate it in this detail by eliciting the statement from David. Accordingly the State cannot rely on this argument to support their claim that the statement was non-hearsay.

The State also argued at trial that the statement was not hearsay because the declarant was also a witness and thus subject to cross-examination. Aside from the unsworn nature of hearsay evidence its most objectionable feature, and the main rationale underlying its exclusion, is the opposing party's inability to test the real value of the testimony by exposing the source of the assertion to cross-examination. (*People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164; *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) Consequently where the out-of-court declarant has been made available for cross-examination at the trial in which the statement is used the admission of the out-of-court statement has been held to be either no error at all because the hearsay objection is inapplicable (*People v. Ward* (1976), 37 Ill. App. 3d 960, 347 N.E.2d 381, *cert. denied* (1977), 430 U.S. 983, 52 L. Ed. 2d 378, 97 S. Ct. 1680; see *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363), or harmless error (*People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164). We need not reconcile these opinions in order to determine that defendant's general objection to the hearsay aspect of the statement at issue in this cause does not provide a basis for reversal of his conviction. The out-of-court declarant, Bealy, testified at trial and was subject to cross-examination by defendant. Thus the statement was either non-hearsay and properly admitted or it was improperly admitted but did

not constitute reversible error. See *People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.

■■ But defendant's central objection to this testimony is that it was improperly used to bolster the credibility of Bealy. The general rule is that a witness may not testify as to statements made out-of-court for the purpose of corroborating in-court testimony relative to the same subject. (*People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.) We have already concluded that this was the State's purpose in introducing the statement and, accordingly, on this specific basis the statement should have been excluded. However, this corroboration was of an isolated, collateral aspect of Bealy's testimony. There was no suggestion that the actions described were those of the defendant. Furthermore the State did not rely solely on Bealy's testimony to convict the defendant; as we have noted the State adduced the independent fact that the defendant was in possession of the car taken in the robbery shortly after its occurrence, a circumstance which in itself provided an inference of guilt since the defendant failed to explain this. Under these circumstances we find that the admission of this testimony, although improper in that it corroborated one aspect of the testimony of another witness, was not so prejudicial as to deprive the defendant of his right to a fair trial and consequently we will not reverse on that basis. *People v. Smith* (1978), 64 Ill. App. 3d 1045, 382 N.E.2d 298; *People v. Buckley* (1976), 43 Ill. App. 3d 53, 356 N.E.2d 1113.

### III.

Next, Bonds contends that the trial court erred in giving the so-called *Prim* instruction to the venire since, obviously, there was no deadlocked jury.

It is true that the Illinois Supreme Court in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, directed that the trial courts of this State, when faced with deadlocked juries, comply with the standards suggested by the American Bar Association Minimum Standards Relating to Jury Trials which include the giving of an instruction similar to that set forth in *Prim*. The court stated that while it recognized the possible coercive dangers inherent in a supplemental instruction to a deadlocked jury, it did not "feel that a jury should be left to grope in such circumstances without some guidance from the court. Jurors, and especially those voting in the minority, conceivably could feel a coercive influence if when seeking guidance from the court they are met with stony silence and sent back to the jury room for further deliberation." 53 Ill. 2d 62, 74.

However, there is nothing in the language in *Prim* to indicate that the court intended to limit the giving of the instruction solely to situations

where the jury was deadlocked. To the contrary, the court stated that it was of the belief that the adoption of the ABA standards set forth in the opinion would resolve the many questions created by the uncertainty attendant upon instructing a jury that is in disagreement. Those standards provided that such an instruction may be given before the jury retires for deliberation and if the jury later appears to be unable to agree the court may give or repeat the instruction.

■■ It seems to us that any possible coercive effect of the giving of a *Prim* instruction would be less when it is given to the venire than when it is given to a deadlocked jury. (Compare *People v. Iverson* (1973), 9 Ill. App. 3d 706, 292 N.E.2d 908, *appeal denied* (1973), 53 Ill. 2d 609, and cases cited therein.) The time when the instruction is given, whether as part of the original series, or after a deadlock is found to exist, is a circumstance to be considered in the determination of the coercive effect of the language used. (*People v. Iverson* (1973), 9 Ill. App. 3d 706, 292 N.E.2d 908, *appeal denied* (1973), 53 Ill. 2d 609.) As the supreme court conceded in *Prim*, there are possible coercive dangers inherent in a supplemental instruction given to a deadlocked jury. But the same coercive dangers do not exist when such instruction is simply one of many given to the venire instructing them as to the nature of the trial and general factors to be considered. In any event, as this court ruled in *People v. Kent* (1973), 15 Ill. App. 3d 523, 305 N.E.2d 42, any possible coercive effect of the instruction is sufficiently minimized by its being given as part of the original *voir dire* panel instruction and does not detract from defendant's right to a fair trial. Furthermore, in the case at bar, the evidence against the defendant was so overwhelming that we cannot say that absent the giving of the instruction the verdict might have been different. *People v. Kirk* (1979), 76 Ill. App. 3d 459, 394 N.E.2d 1212.

## IV.

■■ Finally Bonds urges us to reduce the sentence in light of the mitigating factors of his age, family support and of his mother's concern for him. The trial judge was aware of these factors. He was also aware of the fact that, despite Bonds' youth, this was the fourth time he was convicted of a crime and that in the commission of the crime and his flight from the police he showed an utter disregard for human life. In light of these factors we cannot say that the sentence, while severe, is unreasonable.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.