THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KEVIN HEMPHILL, a/k/a Kelvin Cade, Defendant-Appellant.

First District (4th Division)   No. 77-742

Opinion filed July 20, 1978.

Ralph Ruebner and Kathy M. Morris, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ellen Dienes, and Timothy D. McMahon, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Kevin Hemphill, was found guilty of rape (Ill. Rev. Stat. 1977, ch. 38, par. 11—1), robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—1), and burglary (Ill. Rev. Stat. 1977, ch. 38, par. 19—1). He was sentenced to concurrent terms of 20 to 60 years for rape, 6 to 20 years for robbery and 6 to 20 years for burglary.

On appeal, defendant contends: (1) that his guilt was not established beyond a reasonable doubt; (2) that the trial judge erred in his opening remarks to the jury when he stated that testimony would not be read to them during their deliberations because no transcript would be available for that purpose; (3) that in sentencing the defendant, the trial court failed to comply with the presentence report provisions of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, pars. 1005—3—1 through 1005—3—4); and (4) that the sentences are excessive.

We affirm the defendant's conviction. We find it necessary, however, to vacate the sentences imposed and to remand for resentencing due to the trial court's failure to comply with the Unified Code of Corrections' presentence report provisions.

The victim testified that on August 12, 1975, at approximately 11:10 p.m., she was awakened in the bedroom of her third floor apartment at 78 East Elm Street, Chicago, by the sound of a clock radio falling to the floor. The bedroom had one window which was accessible to an alley

below by means of a fire escape. As the victim opened her eyes, she observed a man, who she later identified as the defendant, climbing through her bedroom window. She screamed. The defendant leaped upon her, shoved a pillow over her face and warned "don't yell or I'll hurt you."

The defendant asked if there was any money or jewelry in the apartment. The victim responded that she had three dollars in her purse and some jewelry on the dresser. After rummaging through a jewelry box, the defendant asked what was in the other rooms. When the victim replied that there was a television set and a stereo, the defendant left the bedroom for two minutes. During this time, the victim was lying still in the bed, her face covered by the pillow.

When the defendant returned, he walked to the bed, removed the victim's underwear and against her will performed an act of intercourse. Upon completion of the act, the defendant stood up on the right side of the bed and, while facing the victim, began to dress. The victim testified at the preliminary hearing that the defendant was standing within her reach, but recanted that testimony at trial when she stated that he was standing at the foot of the bed.

While the defendant was dressing, the pillow that had covered the victim's face slipped off, allowing her to view him for approximately one minute. Although there were no lights on in the apartment, the bedroom was illuminated by flood lights which were attached to the building's exterior wall and located near the bedroom window and by lighting in the alley below. This illumination allowed the victim to discern everything in the bedroom, including the pictures on the wall.

When he finished dressing, the defendant picked up the television set, told the victim he had to meet "the others" and warned her not to call anyone for 15 to 20 minutes. The defendant then climbed out the bedroom window onto the fire escape and left. The entire incident lasted approximately 20 minutes.

Following the defendant's departure, the victim remained in bed for five minutes and then got up and called police. When the police arrived at the apartment she could only describe her assailant as a black man. She was then transported to Henrotin Hospital where vaginal smears confirmed the presence of human spermatozoa. Upon completion of the test, she was taken to the 18th district police station where she told police her assailant was wearing dark trousers and a peach-colored jersey-type shirt with long sleeves.

Chicago Police Officer Ken Lunsford testified that on the night of August 12, 1975, he responded to a radio dispatch of a burglary in progress at 77 East Division Street; the dispatch included the description of a suspect car. After turning east on Division, Officer Lunsford spotted a

car traveling west that fit that description. He made a U-turn and pulled the car to the curb. This stop occurred at 11:35 p.m. approximately 1½ blocks from the victim's apartment.

The defendant was in the back seat of the car with a television set beside him. He was wearing dark trousers and a "pinkish" colored pull over shirt with long sleeves. Two other occupants, William Rufus and Floyd Williams, were in the front seat. Officer Lunsford ordered the three men out of the car and searched them. Three one dollar bills were taken from Rufus' right pants pocket and $111 from his sock. When the officer searched the car, he found a watch and screwdriver on the floor of the back seat.

The three men and the property were transported to the 18th district police station, where the victim was still being questioned. The victim identified the television set, the watch and the three dollars seized by Officer Lunsford as the property taken from her apartment. She was then asked if she would be able to recognize her assailant. She said she would. Officer Lunsford told her three men had been arrested with her property in their car.

Approximately two hours after the victim had been raped, a five-man lineup was conducted. Officer Lunsford testified that at the time of the lineup the defendant's outer shirt had been removed and he was wearing only a T-shirt. The victim viewed the lineup and positively identified the defendant as her assailant. She also identified the defendant at trial.

Following the close of the State's case, the defense called as a witness Emily Moore, the defendant's girlfriend. She testified that she was with the defendant on the night of August 12, 1975. They had walked together through the gold coast and old town areas of Chicago before stopping at a Hasty-Tasty restaurant located at the intersection of Clark and Division. Although Ms. Moore testified on direct that the defendant was wearing blue jeans and a T-shirt that evening, she admitted on cross-examination that she could not recall what he was wearing. She testified that when they left the restaurant, the defendant entered a car which was driving by. She then walked home alone.

William Rufus testified that on the night of August 12, 1975, between 9:30 and 10:30 p.m., he was driving his father's car and had dropped some friends off at a downtown movie theatre. As he was heading towards home, north on Clark Street, he spotted Floyd Williams carrying a television set. Rufus honked the car's horn to get Williams' attention and then stopped to let him in.

Williams testified that he had purchased the television set that night from a man he met at the intersection of Clark and Delaware. Williams described the seller as 5 foot 9, dark, with a natural and testified "he acted like a junkie * * * like he needed some stuff."

After picking up Williams, Rufus continued driving north on Clark.

Rufus spotted the defendant standing on the corner of Clark and Division. When the defendant saw Rufus and Williams in the car he signaled for them to stop. Rufus turned west on Division street, pulled to the curb and let defendant in. The defendant climbed into the back seat.

Rufus and Williams testified that as soon as defendant settled in the back seat, the police drove up and ordered them from the car. The police searched the three men and the car. Rufus and Williams denied seeing a wristwatch or screwdriver on the floor of the car's back seat. Rufus testified though that his father always kept tools in the car. Williams also testified that he had not only purchased a television set that night, but also some rings and watches. Rufus denied that the police found $3 in his right pants pocket.

The defendant testified in his own behalf. He substantially corroborated the testimony of the other three defense witnesses. He also testified that he was wearing a pair of purple pants and a T-shirt the night of August 12. He denied having ever seen the victim prior to the lineup. In response to his own attorney's questioning, he admitted he had been convicted of robbery on November 12, 1975, and had been sentenced to serve 2 to 6 years.

Following the close of the evidence and after having heard closing arguments, the jury deliberated and found the defendant guilty of rape, robbery and burglary. Immediately following the return of the jury's verdict, the trial judge asked the defendant:

"When I sentenced you the last time was there a presentence investigation?

THE DEFENDANT: No, sir, there wasn't.

THE COURT: Was that on a Bench trial?

THE DEFENDANT: Yes, sir.

THE COURT: We'll pass it and get the presentence investigation, and then we'll proceed."

When the defendant's case was called later that same day, the trial judge stated:

"I have received the presentence investigation. Does either side have anything to say prior to my imposing sentence?"

The prosecution made no argument in aggravation. Defendant told the court he was innocent. The trial judge then sentenced the defendant to concurrent terms of 20 to 60 years for rape, 6 to 20 years for robbery and 6 to 20 years for burglary. This appeal followed.

OPINION

I

Defendant initially contends that he was not proved guilty of rape, robbery and burglary beyond a reasonable doubt. We disagree.

■■ A reviewing court may not substitute its judgment for that of the

jury on questions involving the weight of the evidence or the credibility of the witnesses (*People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601), and we will not reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631). " '[W]here the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and [she] viewed the accused under such circumstances as would permit a positive identification to be made.' " *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320, quoting *People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631, 634.

■■ The victim, in this case, viewed her assailant for one minute, at close range, in a room illuminated with enough light to allow her to discern the pictures on the wall. Her degree of attention was understandably high. There was testimony that the victim's preliminary description of her assailant accurately fit the defendant's description when he was arrested. The victim told the police that she would be able to identify her assailant. The lineup was held only two hours after she had been raped. She positively identified the defendant both at the lineup and in court. Her testimony was unwavering and unimpeached in any material manner. In summary, we find the victim's identification was clear and convincing. Further, the victim's testimony was supported by corroborating evidence. The defendant was arrested shortly after the crime, in a car 1½ blocks from the victim's apartment, with the victim's television set beside him and her watch at his feet.

■■ The defendant attacks the victim's identification by pointing out that her preliminary description was vague in that she could only describe her assailant's gender, race and common mode of apparel. An identification, however, is usually not made by distinguishing separate physical features but by the total impression made upon the witness. (*People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756.) Therefore, omissions in preliminary descriptions, where the witness had an adequate opportunity to observe the offender, do not affect the credibility of the witness' identification nor do they raise a reasonable doubt of the defendant's guilt. (*People v. McCall* (1963), 29 Ill. 2d 292, 194 N.E.2d 222; *People v. Tunstall* (1959), 17 Ill. 2d 160, 161 N.E.2d 300; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454.) This is particularly true in this case as the defendant had no abnormal or distinguishing physical characteristics. See, *e.g.*, *People v. Miller* (1964), 30 Ill. 2d 110, 195 N.E.2d 694 (defendant's facial scar not noted by witness).

■■ The defendant also attempts to weaken the victim's identification by arguing that the lineup procedure was tainted. He points out that before the lineup was held, a policeman told the victim that three men had been

arrested with her property in their possession. Considered in context, we do not find this statement unduly suggestive. Prior to the statement being made, the victim had identified property exhibited to her by the police as the property taken from her apartment and she was asked to view a five-man lineup. The policeman's comment, considered in this context, merely stated the obvious; the police had arrested someone with her property. Whenever a lineup is held there is an unavoidable suggestion that the police have arrested a person they believe is the offender. (*People v. Madden* (1977), 52 Ill. App. 3d 951, 368 N.E.2d 384; *People v. Marshall* (1966), 74 Ill. App. 2d 472, 221 N.E.2d 128.) In any event, what effect, if any, this comment had on the weight to be accorded the victim's identification testimony was for the jury to assess.

We find that the totality of the evidence establishes the defendant's guilt beyond any reasonable doubt and we will not reverse his conviction.

## II

■■ Defendant next argues that the trial judge erred when he stated in his opening remarks to the jury:

"[W]hen you begin your deliberation a transcript is not available. In well-publicized cases you hear or read the jury calls back and says we want witness X or witness Y's testimony re-read to you; that will not happen in this case, there will be no transcript available for that purpose, so maintain a high level of interest."

Initially, defendant claims that this statement indicates the trial judge erroneously believed he lacked discretionary authority to allow the jury to review testimony during its deliberations. The defendant cites *People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166, and *People v. Autman* (1974), 58 Ill. 2d 171, 317 N.E.2d 570, for the proposition that"[t]here is error when a trial court refuses to exercise discretion in the erroneous belief that it has no discretion * * *." *People v. Queen* (1974), 56 Ill. 2d 560, 565, 310 N.E.2d 166, 169.

This argument is without merit. The trial judge did not state he could not allow the jury to review testimony during its deliberations but that "there [would] be no transcript available for that purpose." This implies recognition by the judge that he did have discretionary authority to furnish such a transcript. (See *People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511.) The trial judge was aware of his discretionary authority to allow the jury to review testimony during its deliberations and his statement indicates he was exercising this discretion.

Defendant argues further that if the judge was aware of his discretionary authority, he abused it by making this opening statement to the jury. The defendant reasons that this statement had the effect of barring the jury from making any requests to review testimony during its

deliberations. He points out that while a transcript may not have been available, requested testimony could have been read from a court reporter's notes.

Even if it can be said that the able and experienced trial judge abused his discretion in this case, the error would be harmless in light of the overwhelming evidence of defendant's guilt. (*People v. Calhoun* (1977), 46 Ill. App. 3d 691, 361 N.E.2d 55.) We recognize an argument can be made to the effect that the recital of this type of opening statement to the jury might unnecessarily chill the jury's right, during its deliberations, to request a review of certain testimony. However, we take note of the practical problems encountered by a trial court in having a transcript available during the jury's deliberations. We recognize that while testimony can be read from a court reporter's notes, different court reporters may be utilized throughout the course of a trial, raising serious problems in isolating precise testimony. Also, the particular court reporter needed may not be available. (See *People v. Farley* (1976), 37 Ill. App. 3d 178, 345 N.E.2d 724; *People v. Page* (1976), 39 Ill. App. 3d 728, 350 N.E.2d 262.) We agree that all of these problems are variables that can better be taken into consideration during the jury's deliberations when a request to review testimony is made, rather than at the beginning of trial. But we do not feel that any error committed here was prejudicial.

### III

The third contention raised by defendant is that the sentences imposed must be vacated and the cause remanded for resentencing due to the trial court's failure to comply with the presentence report provisions of the Unified Code of Corrections. (Ill. Rev. Stat. 1975, ch. 38, pars. 1005—3—1 through 1005—3—4.) We agree.

Before sentencing an individual convicted of a felony, the trial court must acquire and consider a written presentence investigation report. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—3—1.) Section 5—3—1 does provide that a defendant may waive his statutory right to the presentence report. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—3—1.) The report is to contain certain prescribed information including the history and character of the defendant, his mental and physical condition and his social situation. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—3—2.) The report must be filed of record and made available to, among others, the defendant's attorney "at least 3 days prior to the imposition of sentence, unless such 3 day requirement is waived" (Ill. Rev. Stat. 1975, ch. 38, par. 1005—3—4(b)(2)), and to the "appellate court in which the * * * sentence is subject to review" (Ill. Rev. Stat. 1975, ch. 38, par. 1005—3—4(b)(3)).

In this case, the record discloses that the trial court failed to comply with these presentence report provisions. Immediately following the

jury's return of a guilty verdict, the trial judge asked the defendant: "When I sentenced you the last time was there a presentence investigation?" The defendant responded that there was not. The trial judge, however, seemingly convinced that such a report was prepared, then stated "We'll * * * get the presentence investigation and then we'll proceed." When the defendant's case was called later that same day, the trial judge stated:

"I have received the presentence investigation. Does either side have anything to say prior to my imposing sentence."

■■ The State does not contend that defendant waived his right to a presentence investigation report. (See *People v. Meyers* (1977), 56 Ill. App. 3d 176, 371 N.E.2d 1130; *People v. Comerford* (1975), 35 Ill. App. 3d 287, 341 N.E.2d 131.) Rather, it argues that the trial judge's statement is evidence that a presentence report was prepared and considered. While it appears there was some kind of presentence report before the trial judge, the report was never filed of record and is not available to us as required by section 5—3—4 (Ill. Rev. Stat. 1975, ch. 38, par. 1005—3—4). Consequently, it is impossible to ascertain with certainty the origin of the report, when it was prepared or what it contained. While various inferences can be drawn from the record, we will not engage in conjecture. Furthermore, the presentence report was not made available to the defendant's attorney at least 3 days prior to the imposition of sentence, as mandated by section 5—3—4 (Ill. Rev. Stat. 1975, ch. 38, par. 1005—3—4(b)(2)). The record fails to disclose a knowing and voluntary waiver of this requirement by the defendant. (See, *e.g., People v. Lambrechts* (1976), 41 Ill. App. 3d 729, 355 N.E.2d 53.) Because of the failure to comply with the provisions of the Unified Code of Corrections the sentences must be vacated and the cause remanded for a new sentencing hearing. *People v. Comerford* (1975), 35 Ill. App. 3d 287, 341 N.E.2d 131.

Although defendant urges that the sentences imposed were excessive, in view of our disposition of this appeal, it is unnecessary to reach that issue.

The judgment of conviction of the circuit court of Cook County is affirmed, but the sentences are vacated and the cause remanded to that court with directions that defendant be granted a new sentencing hearing in accordance with the provisions of the Unified Code of Corrections.

Judgment of conviction affirmed; sentences vacated and cause remanded with directions.

DIERINGER and ROMITI, JJ., concur.