THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KEVIN TOLBERT, Defendant-Appellant.

First District (1st Division)   No. 78-1630

Opinion filed February 4, 1980.—Rehearing denied March 25, 1980.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Kevin Tolbert (defendant) was convicted of murder and armed robbery. He was sentenced to 16 to 20 and 6 to 20 years respectively. He appeals.

In this court defendant urges the State failed to sustain its burden of proving that confessions by defendant were voluntarily made; the State failed to prove defendant guilty beyond reasonable doubt by evidence other than defendant's own confessions; the trial judge erred in communicating with the jury outside of the presence of defendant and his counsel and abused his discretion by denying the jury's request to hear testimony of a police officer and two defense witnesses although the trial judge did read defendant's statements and in this manner gave said statements undue prominence; and the trial court erroneously considered defendant's prior arrests in imposing sentence.

James Henderson died on a Chicago street during the early morning of July 27, 1975. The cause of death was a bullet wound of the head. At trial, Carrie Henderson, wife of the victim, testified that she accompanied him to a bar on Fifth Avenue shortly west of Pulaski Road in Chicago. The couple remained in the lounge until about 10:30 p.m. The deceased and others indulged in drinking and gambling. About 1:30 a.m. the deceased walked home to use the washroom. Mrs. Henderson remained in the lounge until it closed at 3 a.m. She then drove home with two friends.

She testified she saw a crowd of people and some police officers in the 600 block of South Karlov Avenue. She saw her husband bleeding on

the sidewalk. Later at home she found one money clip belonging to the deceased. She thought there should be a second such clip. In the belongings of her late husband she found less than $100. The police gave her an additional $25. She saw a jacket under her husband's head on the sidewalk. It was not his jacket. She had never seen it before.

Police Officer John Cruz went to the Karlov location after a radio call at about 3 a.m. Several lights on the block were not working. Lighting conditions were "rather poor". He saw a "plaid jacket" under the head of the deceased. There was a pool of blood at the head of the deceased. The officer remained there about half an hour. He did not recall seeing Mrs. Henderson at the scene.

Officer Thomas Clinton testified he recovered a man's "multicolored jacket" from under the back and head of the deceased. He stated the jacket was "not plaid."

The autopsy testimony showed an entrance bullet wound in the outer aspect of the left eye. The resulting wound to the brain was the cause of death. The bullet was retrieved.

Officer Percy Hollins testified that on September 20, 1975, he and Officer Robert Wasmund were assigned to speak to a person in custody in the lockup who had some information regarding a homicide. At the lockup they met the defendant. Defendant told the officers "he wanted to explain about a killing that happened on Karlov Avenue earlier".

In an interview room defendant was given his *Miranda* rights. He told the officers he understood these rights. Defendant told the officers he was 16 years old. After a check of police records, Hollins arrived at the opinion that defendant was then 17 years of age. To eliminate any possible doubts the officers then contacted Youth Officer Patricia Partika. She returned with Hollins to the interview room and remained there.

Defendant told the officers he had been to a party on Arthington Avenue, about 4000 west. About 2:30 a.m., defendant, accompanied by Kevin Davidson, Clay Horton and a person named Callahan left the party. At Davidson's home they talked about going out for a "stickup". Defendant put on a ladies' coat, Davidson put on a short plaid jacket and Horton put on a jacket. Horton and defendant walked on the east side of Karlov Avenue in the 600 block and Davidson on the west side. A man approached on the east side. Davidson ran up with a gun and said it was a stickup. The man attempted to seize the weapon and Davidson shot him in the face. All three ran back to Davidson's house. Defendant discarded the ladies' coat in a garbage can. Defendant removed the clip and all bullets from the pistol, a .45 automatic. Davidson hid the gun in his basement. Defendant went to his father's house where he had more bullets. All of the bullets were thrown into a sewer. Defendant walked

back to the scene and saw the victim lying on the ground. He stayed there about 10 minutes and then went home by taxicab.

Then, also in the presence of Youth Officer Partika, at about 3:20 a.m., the defendant gave a similar statement which was typewritten by Officer Hollins. Hollins asked defendant to correct any errors in the statement. Defendant checked the statement. He corrected his age from 17 to 16, initialled each page and signed the statement, dated September 20, 1975.

This first completed written confession was substantially the same as the first oral confession. The written confession was read to the jury. The oral confession was that defendant and his friends left the party about 2:30 a.m. In the written confession they left at 12:30 a.m. and the shooting occurred at 2:30 a.m. The written confession recited that defendant had taken the automatic pistol in a previous burglary and sold it later. The written confession added that the street lights were off at the time; nothing was taken from the victim and defendant did not know how Davidson's jacket got under the head of the victim.

Ernest Blomquist, then assistant State's Attorney, testified that on the morning of September 22, 1975, about 10 or 10:30 a.m., he spoke to an officer named Bertucci. The officer said defendant wished to talk to an assistant State's Attorney about the Henderson homicide. Blomquist interviewed defendant at about 11 a.m. He gave defendant his *Miranda* rights. Defendant stated he understood these rights. Defendant said he did not want a lawyer or anyone else to be present. Blomquist testified defendant told him verbally about going out with the two men, changing clothes and the homicide, as above related. Defendant said he would give a statement to the court reporter. At about 12:50 p.m. the confession was taken by the reporter, typed, read by defendant and signed. On that date, other charges pending against defendant were dismissed.

Blanca Lara, a qualified court reporter, who had taken and transcribed the written confession, testified that, after defendant had corrected, signed and initialled the document, she took his picture with a Polaroid camera. She then endorsed the date, time and place on the back of the picture and signed it. Defendant wrote his name, address and age on the back of the picture. Assistant State's Attorney Blomquist also signed the back of the photograph. Blomquist testified defendant "looked healthy" at that time. The State then rested.

On behalf of the defendant, Alberta Walker, a friend of deceased and his widow, testified she saw the victim and his wife at the bar. The deceased had "a roll of money" and was gambling. This witness left the bar between 2:30 and 2:45 a.m. She drove west on Fifth Avenue and saw the victim standing on the corner of Karlov Avenue. There were two men

and a lady with the deceased. One man was short and "really dark" and wore blue jeans and a vest. The other was about 6 feet 2 inches tall, also dark, and wore a blue jean jump suit. There was also a slender, dark lady weighing 105 or 110 pounds wearing yellow or beige clothes. None of these people wore coats. The witness testified the street lights were out and it "was dark" but her car lights were on so she could see. She stopped her car and the deceased looked at her but did not greet her. She did not see a plaid jacket or a woman with a long coat. She did not hear a shot. She did not see a gun. Defendant was not present. The deceased was then facing toward the lounge.

R. C. Jones, a friend of the deceased, saw deceased at the lounge. The deceased was shooting dice. The deceased had two $100 bills in his possession. He put these bills in a money clip and said they were vacation money which he was "not going to lose." Some time later, about 10:30 p.m., the deceased told the witness he had "won over one hundred dollars." The street lights were off on Karlov that night.

Genelle Treadwell testified she lived on Karlov Avenue. One night during the summer of 1975 she heard a shot and heard a woman scream a couple of seconds later. She did not look out of her windows. She could not recall the date or time of the shot and was not sure if the street lights had been on.

Police Officer Thomas McCarthy testified to a conversation with Officer Hollins on September 6, 1975. Hollins told him an anonymous source told Hollins the three persons believed responsible for the homicide were Clyde and Clay Horton and Calvin Davis. Officer McCarthy testified he could not locate Davis in the 4000 block of West Fifth Avenue. He found a person named Kevin Davidson lived at 4049 Fifth Avenue. Davidson went with him to the police station, for about 2 or 3 hours and went home. Later, Officer McCarthy took a sample of Kevin Davidson's hair. A microanalyst testified she had examined and compared hair taken from the jacket found under the victim's head and this hair from Kevin Davidson's head. The two samples were morphologically dissimilar.

Counsel for defendant made a pretrial motion to quash defendant's arrest and to suppress defendant's confessions. The trial court denied the motion. No point is raised in this court regarding the arrest. However, we will summarize the testimony heard on the motion regarding the background of the confessions.

Officer Kevin Kavanaugh testified he arrested defendant on August 27, 1975, on a bond forfeiture warrant resulting from a charge against defendant for possession of a controlled substance. Kavanaugh had information an unidentified woman had told Officer Tom Grapenthein that a person named "Kevin" was near the Henderson homicide at the

time. Officer Kavanaugh talked with defendant only about the charge which resulted in issuance of the warrant. Defendant told Officer Kavanaugh he was born June 6, 1958. We note this would make the defendant older than 17 years at the time of the arrest by Officer Kavanaugh.

Police Officers Guiliano and Kozlowski testified severally to the following facts. On September 19, 1975, at 2:45 a.m., they were driving in an unmarked vehicle in a high crime rate area. They saw defendant. Officer Guiliano had seen defendant three or four times before. Defendant turned and walked in a different direction in a hurried manner. The defendant threw a shiny object into a store entrance. The officers called on defendant to stop. They asked him to step over to the vehicle which he did. Kozlowski asked defendant what he had thrown away. Defendant said, "I'm sixteen years old." Kozlowski repeated the question. Defendant did not respond. About 13 .32-caliber cartridges were found in defendant's pocket. He was placed under arrest for curfew violation. In the store doorway the police recovered a .32-caliber Harrington and Richardson nickel-plated revolver.

Defendant was taken to the police station. The officers began to process him as a juvenile. A youth officer verified that defendant was 16 years old. However, records at the Audy Home showed defendant was 17 years. The police then processed defendant as an adult. Police ascertained the nickel-plated pistol had been stolen in a robbery. The victim of this crime was summoned. Defendant was identified in the resulting lineup and was charged with armed robbery.

Officers Percy Hollins and Robert Wasmund testified severally to these facts. About 1:30 a.m. on September 20, 1975, pursuant to assignment, they interviewed defendant. Defendant was given his *Miranda* rights and stated he understood them. Defendant then told the officers he was 16 years old. By police department inquiries, Officer Hollins ascertained that defendant had given his age as 17 when he was arrested. Hollins then called Youth Officer Partika. Defendant made oral and written confessions to the officers in her presence as described at trial.

Youth Officer Partika recalled only having been present during the taking of the written statement. She had no conversation with defendant. No effort at that time was made to contact defendant's mother. Defendant did not request that this be done.

Officer Frank Bertucci testified that on September 20, 1975, about 8 a.m., Officer Hollins showed him defendant's written statement. Bertucci made police inquiries and was informed by the Bureau of Identification that defendant was born June 6, 1958. The Bureau of Vital Statistics was closed at that time. On Monday morning, Officer Bertucci obtained a birth certificate which showed defendant's birthday was June 6, 1959. On

September 22, a court bailiff, Murray Mattenson, testified he told defendant the police had wanted to speak with him and defendant was not obliged to do this. Defendant responded he wouldn't talk to the police. Mattenson told defendant he could call his family or a lawyer but defendant said he did not care to do this.

Officer Bertucci also told defendant on that day that he would be transferred to the juvenile court and the judge would determine whether or not he should be tried as an adult. The cases against defendant were actually transferred to the juvenile court. Bertucci also asked Youth Officer Madkin to contact defendant's parents. Defendant's mother was told that he had been charged with robbery and murder and defendant would like her to come to the station. She refused to come. Defendant's mother was told he was about to give a statement regarding a homicide. She responded that she would not come to the station.

By stipulation of the parties, the two written confessions were received in evidence. The trial court denied motions to quash the arrest and suppress the statements. The trial court found the stop and search of defendant was proper; defendant was properly advised of his rights and his confessions were voluntary.

## I.

■■ The Supreme Court of Illinois has consistently held, "the receiving of an incriminating statement by a juvenile is a sensitive concern." (*People v. Prude* (1977), 66 Ill. 2d 470, 476, 363 N.E.2d 371, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418.) The courts of Illinois have adhered to the principles established by *In re Gault* (1967), 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, which requires the "greatest care" to make certain not only that an admission by a juvenile was voluntary "but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." See *People v. Simmons* (1975), 60 Ill. 2d 173, 179-80, 326 N.E.2d 383.

In determining whether a confession was voluntary, we are required not to depend upon any one aspect or factor but to consider " 'the totality of all the relevant circumstances.' " (*Prude*, 66 Ill. 2d 470, 475, and other authorities there cited.) The burden of proving a confession was voluntary rests upon the State. (Ill. Rev. Stat. 1977, ch. 38, par. 114—11(d).) But, the degree of proof required of the State has been described as "one of persuasion and not beyond a reasonable doubt." (Ill. Ann. Stat., ch. 38, par. 114—11, Committee Comments, at 345 (Smith-Hurd 1977).) Consequently the rule is that in determining whether a confession is voluntary "the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the

evidence." *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731. See also *People v. Wipfler* (1977), 68 Ill. 2d 158, 172, 368 N.E.2d 870; *In re Potts* (1978), 58 Ill. App. 3d 550, 554, 374 N.E.2d 891.

■■ Considering the entire matter of the confessions here, there is no evidence of actual physical or mental coercion. It is conceded that each and all of the four confessions are substantially similar. The defendant never at any time denied his participation in the homicide. He continuously reiterated the facts of his conduct. Defendant himself first proposed that he make a confession to the police. We also find from this record that defendant appears to be a young man of normal intelligence who has had two years of high school education. The record shows that defendant "had previous encounters with the police." *Prude*, 66 Ill. 2d 470, 476.

Defendant was fully aware of his possible criminal responsibility. Defendant acquired a gun in a robbery. He quickly discarded the weapon in a doorway when he saw the police were about to stop him for questioning. Defendant was identified by an eyewitness in an unrelated armed robbery. Although defendant's counsel made a motion to quash his arrest, no argument is made in this court regarding the validity of the initial arrest. Consequently it appears that all of the arguments made in this court concerning the reasonability of the four incriminating statements amount to a complaint that defendant was unlawfully detained and that the police failed promptly to communicate with and obtain the presence of a youth officer and parents of the defendant.

The courts of Illinois hold that "unlawful detention will not, of itself, invalidate a confession or statement of an accused." (*People v. Zepeda* (1970), 47 Ill. 2d 23, 27, 265 N.E.2d 647, and cases there cited.) The Juvenile Court Act provides that when a minor is taken into custody the police "shall immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care * * * that the minor has been taken into custody and where he is being held; and the officer shall without unnecessary delay take the minor to the nearest juvenile police officer * * *." Ill. Rev. Stat. 1977, ch. 37, par. 703—2(1).

In the case before us, as above shown, there was reasonable doubt in the minds of the police as to whether defendant was actually a juvenile. If defendant was born on June 6, 1958, he would have been over 17 years of age at the time of his first arrest on August 27, 1975. This condition probably accounted for a good part of the delay. However, this record shows the police did in fact communicate with defendant's mother by telephone and she refused to take any steps. In addition, the police contacted Youth Officer Partika. She was present at the time defendant made an oral statement and also a written confession to Officer Hollins.

Viewing the totality of all of the circumstances before us, we cannot find that any delay in notifying the parents of the minor or in obtaining the presence of the youth officer were of sufficient significance to require exclusion of the confessions made by respondent. See *Potts*, 58 Ill. App. 3d 550, 556; also *In re Stiff* (1975), 32 Ill. App. 3d 971, 978, 336 N.E.2d 619. ■■ The ruling of the trial judge is strongly supported by the manifest weight of the evidence. We conclude that the written and oral confessions made by defendant were properly received in evidence.

## II.

Defendant urges a conviction may not be based upon a confession alone. In *People v. Melquist* (1962), 26 Ill. 2d 22, 28, 185 N.E.2d 825, *cert. denied* (1963), 372 U.S. 967, 10 L. Ed. 2d 130, 83 S. Ct. 1093, the court held:

> "The *corpus delecti* of the crime of murder consists of two essential elements: the fact of death, and the fact that the death was produced by the criminal agency of some person."

In *People v. Holmes* (1977), 67 Ill. 2d 236, 239-40, 367 N.E.2d 663 quoting from *People v. Norcutt* (1970), 44 Ill. 2d 256, 263, 255 N.E.2d 442, the court stated the decisive principle bearing on this phase of the case before us:

> " 'The * * * contention is that the verdict must be set aside because there was no evidence apart from the confession tending to show that defendant committed the crimes charged. That is not a requirement under our decisions, however. While a conviction cannot be based on a confession alone, the other evidence in the case need not be sufficient by itself to connect the defendant to the offense. (*People v. Lueder*, 3 Ill. 2d 487, 488-9; *People v. Jones*, 26 Ill. 2d 381, 385-7.) It is enough if the other evidence either tends to show that a crime did in fact occur (see, *e.g., People v. Bishop*, 359 Ill. 112, 114-15,) or to corroborate the confession (see, *e.g., People v. O'Neil*, 18 Ill. 2d 461).' "

This principle has also been set forth in *People v. Murphy* (1978), 65 Ill. App. 3d 935, 941, 382 N.E.2d 1260, *appeal denied* (1978), 71 Ill. 2d 620, where this court cited *Holmes, Norcutt, People v. Lueder* (1954), 3 Ill. 2d 487, 488, 121 N.E.2d 743.

In the case before us there is no reasonable doubt that a crime did in fact occur and the confessions of the defendant are strongly corroborated by each and all of the following: defendant told Officer Hollins that the defendant wished to explain a killing that had occurred on Karlov Street; the fact that the deceased was killed by gunshot and the forensic testimony strongly support the theory of homicide; the possibility of self-

infliction of the fatal wound is completely negated by the absence of a gun or other weapon and by the presence of the folded jacket under the head and shoulder of the deceased.

Furthermore, in the confession defendant states his two companions were wearing jackets. The jacket found under the head of the deceased had been folded and was described either as multicolored or a striped plaid. The finding of the jacket serves to corroborate this portion of the confession. The confession described this jacket as the "stripy-plaid" one worn by Kevin Davidson. The second jacket, allegedly worn by another of defendant's companions, was not described in the record. The place of the killing, as pointed out in the confession, was on the route that the deceased most probably took in walking from the lounge to his home and back. Defendant expressly described the deceased as walking south which would be away from deceased's home and toward the lounge.

The confession is also supported by the testimony of Alberta Walker, defense witness. The two men and the woman that the witness allegedly saw at approximately 2:45 or 3 a.m. could not have been connected with the homicide because the witness heard no shot. Also, the three people described by Alberta Walker did not wear jackets. The testimony of Alberta Walker may be completely true and yet not contrary to the confessions. There was ample time so that the deceased could have met the persons described by her and have later become the victim of the homicide.

In addition, there is evidence by Alberta Walker and by the police that the street lights were not in operation at the place of the homicide. This evidence corroborates the statements to the same effect made in the confessions.

There is a strong intercorroboration among the four confessions made by defendant. All are substantially similar in their factual content. There is evidence that defendant examined the last written confession and corrected it in only one particular, with reference to changing his age expressed therein from 17 to 16.

We will comment upon the scientific testimony regarding morphological dissimilarity between the hairs found on the jacket which was under the head of the deceased and the sample hairs obtained by the police from the head of Kevin Davidson. The jacket referred to as the one worn or put on by Kevin Davidson was not necessarily his. There is no evidence that he was actually the owner of the garment or that he had ever worn it prior to a few minutes before the homicide. The jacket, having been inserted under the head of the deceased, may very well have carried some of the hair from that source. Alternatively, the hair may have come from the unknown actual owner of the jacket. This scientific

evidence is strictly negative. Trial counsel for defendant argued this matter strongly to the jury. The evidence thus presented an issue of credibility which was determined by the verdict.

■ We conclude that the legal test above shown is met. The evidence entirely outside of the confessions proves beyond reasonable doubt that a crime did in fact occur and completely corroborates the various confessions by defendant.

### III.

During its deliberation the jury sent a written message to the judge and asked to see a transcript of testimony of Officer Hollins. The judge denied this request with approval of counsel for defendant.

About 2 hours later the jury again requested the testimony of Officer Hollins and a reading to them of the statements made by defendant. The trial judge made a most diligent effort to locate counsel for defendant. He called their law office and also the restaurant at which they were to eat. Two deputies went through the courthouse in an effort to locate the attorneys. The trial judge personally looked in every courtroom in the building and was unable to locate the defense attorneys. The trial judge then advised the jury in writing that the testimony of Officer Hollins had not been typed and therefore could not be read. The judge also advised the jury that the defendant's testimony could not be read until the attorneys had returned to the courtroom.

The jury then made another request for the testimony of the defense witnesses Alberta Walker and Genelle Treadwell. The trial judge denied this request over the objection of defense counsel. Over objection by the defense, the trial judge read the written confessions of defendant to the jury.

■ As regards the testimony of Officer Hollins, it appears to us this testimony would do nothing to convince the jury that the defendant was not guilty. The testimony of Walker and Treadwell had very little bearing on the guilt or innocence of defendant. We cannot say defendant was prejudiced by refusal of the trial judge to obtain and read a transcript of this evidence. In a situation of this type the matter is one which "is best entrusted to the trial court's sound discretion." (*People v. Pierce* (1974), 56 Ill. 2d 361, 364, 308 N.E.2d 577.) We find no abuse of discretion here.

Furthermore, the testimony of Officer Hollins had not been written up by the court reporter. This raised many practical problems. There might well be problems in obtaining the court reporter to read from the notes. The fact that different reporters were used throughout the trial would further complicate the situation. Our courts have had occasion to comment on the difficulties in fulfilling this type of request. See *People v.*

*Hemphill* (1978), 62 Ill. App. 3d 977, 984, 379 N.E.2d 1284; *People v. Farley* (1976), 37 Ill. App. 3d 178, 180 n.1, 345 N.E.2d 724.

■■ Defendant urges the trial judge himself should not have read the defendant's confessions to the jury but the trial court should have had the court reporter or the State's Attorney read the material. We disagree. The first written confession was typed by Officer Hollins, not by a court reporter. We see no problem in the fact that the trial judge, who conducted the trial with the utmost of care and consistently displayed complete impartiality, read the confessions to the jury. We see no reason for requiring that the State's Attorney read the confessions. No specific criticism is made by defendant concerning the manner in which the trial judge read the confessions. This record does not display the type of situation in which a trial judge showed impatience and hostility by persistent interrogation of witnesses as in *People v. Santucci* (1962), 24 Ill. 2d 93, 99, 180 N.E.2d 491, and *People v. Godbout* (1976), 42 Ill. App. 3d 1001, 1006-07, 356 N.E.2d 865, which are cited and relied upon by defendant. In this regard, defendant's claim of prejudice is "founded on mere conjecture." *People v. Lewis* (1975), 60 Ill. 2d 152, 158, 330 N.E.2d 857.

Defendant closes this portion of the argument by urging that the trial judge communicated with the jury outside of the presence of defendant and his counsel. This pertains to the refusal by the trial judge to give the jurors the testimony of Officer Hollins pursuant to their second request. ■■ This record shows, as above pointed out, the detailed and conscientious steps taken by the trial court to obtain the presence of defendant's counsel. Defendant does have a right to be present whenever a hearing involves his "substantial rights." (*People v. Woods* (1963), 27 Ill. 2d 393, 395, 189 N.E.2d 293.) In a situation of this type the defendant should make some demonstration of prejudice by reason of what occurred. We find no showing of such prejudice in the case before us. *People v. Huston* (1977), 46 Ill. App. 3d 170, 172, 360 N.E.2d 986.

## IV.

Defendant finally urges that in passing sentence the trial court considered defendant's prior arrests which did not result in conviction. At the sentence hearing, the State's Attorney told the trial judge that when defendant made his confessions he was in custody for armed robbery and unlawful use of weapons. The trial judge pointed out these arrests were part of the presentence report which he had read. The fact of these previous arrests was necessarily brought out in connection with the pretrial motion by the defendant to quash his arrest and to suppress evidence.

In this type of situation, we are constrained to rely upon "the sound presumption that the court in a bench trial relies only on proper evidence in reaching a determination on the merits." (*People v. Berland* (1978), 74 Ill. 2d 286, 310, 385 N.E.2d 649, *cert. denied* (1979), ___ U.S. ___, 62 L. Ed. 2d 42, 100 S. Ct. 64; *People v. Gilbert* (1977), 68 Ill. 2d 252, 258-59, 369 N.E.2d 849.) The record before us shows that the trial court expressly enumerated the properly recognized areas of mitigation and aggravation which he had considered. The soundness of his approach is recognized by the fact that the sentence of 16 to 20 years for murder and the concurrent sentence of 6 to 20 years for attempt armed robbery are both reasonable and moderate under the circumstances in this case. We find no abuse of discretion in the sentence here. *People v. Heflin* (1978), 71 Ill. 2d 525, 545-46, 376 N.E.2d 1367, *cert. denied* (1979), 439 U.S. 1074, 59 L. Ed. 2d 41, 99 S. Ct. 848; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

For these reasons the judgments and sentences appealed from are affirmed.

Judgment and sentences affirmed.

McGLOON and CAMPBELL, JJ., concur.