THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE HARRELL, JR., Defendant-Appellant.

Fifth District    No. 80-454

Opinion filed February 19, 1982.

John H. Reid and John W. McGuire, both of State Appellate Defender's Office, of Mt. Vernon, and Arthur P. Brock, law student, for appellant.

John Baricevic, State's Attorney, of Belleville (Martin N. Ashley and Stephen E. Norris, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

In the evening of April 15, 1980, Sandra Antoff went shopping at the K-Mart Store in Cahokia, Illinois. She left the store at about 8:45 p.m. and walked to her car, which was located in the K-Mart parking lot, about three parking spaces from the store. It was dark outside, but the lot was illuminated by several streetlights, one of which was located one or two parking spaces away from Ms. Antoff's automobile.

She placed her packages in the back seat of the car, and, after she had inserted the keys into the ignition, but before she was able to enter the car completely, she heard a man call "Hey ma'am?" Ms. Antoff glanced around the parking lot and discovered that the man was addressing her. He walked up to her and stood within two feet of her, positioned so that she could not shut the driver's door of her car.

The man asked Ms. Antoff if she had seen his car, and he gave her a description of the vehicle. She told him that she had not seen it, and he replied that it must have been stolen, and requested that she give him a ride. She did not oblige and suggested that he report the incident to the police. Ms. Antoff repeatedly informed the man that she was in a hurry to pick up her daughter, but he refused to leave and instead motioned for another man to come to the car from a nearby fried chicken restaurant. The first man asked the second man if the keys had been left in his car, and when the second man replied in the affirmative, the first man said, "No wonder it is stolen then."

The second man, who was standing on the passenger side of Ms. Antoff's car, told the first that it would be "okay" if Ms. Antoff wanted to give the first man a ride, but he would wait for him at the chicken restaurant. The second man returned to the restaurant, and the first bent down, rubbed his stomach, told Ms. Antoff that he had just had surgery, and then drew a pistol. He told her not to say anything, and to move into the passenger's seat.

Ms. Antoff stalled until she saw a K-Mart employee, Tim Jones, walk across the lot. She called out to Jones that the man had a gun and intended to kill her. Jones, who was approximately 30 feet away, saw the man point a pistol at him, so he put his hands up and kept walking. Ms. Antoff then pushed her assailant and ran toward a group of youths on a nearby sidewalk. The man drove off in her car.

At this time, Ms. Antoff reported the incident to the police and a radio dispatch was sent out. Cahokia police officer Richard Watson picked up the dispatch and upon seeing the vehicle go past him gave

pursuit. The driver pulled over to the side of the road, got out of the car and started to run. Watson turned his spotlight on the individual when he was about 100 yards from him, then gave chase on foot but was unable to catch him. The vehicle was dusted for prints, towed and processed. No fingerprints were found and no gun was recovered.

The following day, upon learning that he was wanted by the police, the defendant reported to the Centreville Police Department, where he was taken into custody by the Cahokia Police Department around 3:30 p.m. and arrested for armed robbery. Later that day, a group of nine photographs, including one of the defendant, was shown separately to Sandra Antoff and Officer Watson. Cahokia detective Charles Sharp told Ms. Antoff before she viewed the photographs that they had a suspect in the case and that his photograph was one of the nine. According to his later testimony, he may have told her that they had two suspects. She examined the first five pictures and stopped, stating that the suspect depicted in that photograph was her assailant. The defendant's picture was the fifth in the array. Detective Sharp did not remember whether she was informed that she had chosen their suspect. Ms. Antoff later testified that she did not know whether the suspect in the group had been picked up.

When Detective Sharp showed Officer Watson the array, he told him that a suspect's photograph was included in the array. From this group Watson selected photograph 5, which was the defendant's, and photograph 9 as looking most like the man he saw flee the car on the previous evening. Photographs 5 and 9 differed from the other pictures in that all four edges were straight, while three of the remaining seven pictures had one serrated edge, and the last four had two serrated edges. When Officer Watson stated that he was not definite about which picture belonged to the man he had seen, Detective Sharp told him that the suspect was featured in photograph 5.

On the morning of April 17, Detective Sharp informed the defendant, who had remained at the Cahokia police station overnight, that a lineup was going to be conducted. Sharp suggested that the defendant contact an attorney, and, as the defendant later testified, he called his attorney, Gary Apoian. According to the defendant, he was unable to speak to Apoian because he was said to have been on vacation. But, Sharp testified that after the defendant placed the phone call, he said that his attorney advised him to participate in the lineup. At a motion to suppress the defendant's pretrial identification, attorney Apoian was never called to verify or contradict the defendant's statement.

The defendant was then taken to the St. Clair County jail, where Sharp again stated that he could not refuse to be in the lineup, but that he could have an attorney present during that procedure. The defendant

responded that he understood. A lineup was conducted in the mid-afternoon at the St. Clair County jail, as suggested to Sharp by a St. Clair County assistant State's Attorney earlier that day when Sharp had gone to the St. Clair County courthouse in an unsuccessful attempt to obtain an arrest warrant. Both Ms. Antoff and Officer Watson selected the defendant from the six men in the lineup.

Also on April 17, a criminal complaint was filed charging the defendant with armed robbery, and an arrest warrant was issued. It is not obvious from the record at what precise hour these documents were filed. The defendant moved to suppress all evidence pertaining to his pretrial identification, and following an evidentiary hearing, this motion was denied on July 1, 1980. After a jury trial on July 28, the defendant was found guilty of armed robbery and sentenced to 12 years' imprisonment. He appeals only from his conviction and argues that (1) he was denied his right to counsel at the lineup, (2) the pretrial identification procedures resulted in a denial of due process, and (3) the evidence introduced at trial was insufficient to prove him guilty of armed robbery rather than theft.

In support of his first argument, the defendant claims that he was entitled to counsel at the lineup under the authority of *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, and *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017. The defendant interprets *Kirby* and *Burbank* as giving rise to a right of counsel at any time that "the adverse positions of government and defendant have solidified." (406 U.S. 682, 689, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882.) In this case, according to the defendant, such a "solidification" of positions took place when an assistant State's Attorney became involved in the case on the morning of April 17 by suggesting that a lineup be held.

■■ To this argument the People rely, and we believe correctly, that the reference in *Kirby* to "solidification" of adversarial positions was intended only as an explanation of the specific rule that the right to counsel at a lineup attaches when adversary judicial criminal proceedings have been initiated against the defendant, "by way of formal charge, preliminary hearing, indictment, information, or arraignment" (406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882), or, as the Illinois Supreme Court has stated, "by whatever means." (53 Ill. 2d 261, 272, 291 N.E.2d 161, 167.) This last phrase, used in *Burbank*, was employed to show that the list of proceedings in *Kirby* is not exclusive. It does not dispense with the need for judicial proceedings as a prerequisite to the right to counsel, and in absence of any authority granting a defendant the right to counsel at a lineup conducted at an earlier stage than that mentioned in *Kirby* and *Burbank*, we decline to expand those cases. *People v. Shorter* (1978), 59 Ill. App. 3d 468, 375 N.E.2d 513.

■■ At the hearing on the motion to suppress pretrial identification, Detective Sharp stated that on April 17, he first spoke to the defendant at about 9 a.m. They then went to the State's Attorney's office, where no warrant was obtained, and they returned to the Cahokia police station. Finally, Sharp took the defendant from the station to the St. Clair County jail and the defendant participated in two lineups, at 2 p.m. and 3 p.m. Sharp swore out a criminal complaint against the defendant, dated April 17, and an arrest warrant also issued that day. Based upon this testimony, uncontradicted by the defendant, it is not apparent whether the two judicially approved documents were obtained before or after the lineups. Since we cannot presume the existence of error which is not affirmatively shown of record (*People v. Thorpe* (1977), 52 Ill. App. 3d 576, 367 N.E.2d 960), we must resolve the silence of the record against the appellant. (*People v. Hamilton* (1978), 64 Ill. App. 3d 276, 381 N.E.2d 74.) The filing of a complaint and issuance of an arrest warrant against the defendant must therefore be treated as having occurred after the lineups. Thus, no adversary judicial proceedings had been instituted, and no right to counsel at the lineups had attached. For these reasons, the defendant's sixth amendment rights were not violated, and we need not discuss whether he acted to waive those rights.

Next, the defendant attacks the photographic and lineup identification procedures as unnecessarily suggestive and conducive to mistaken identification. The People concede that, given his limited opportunity to view the driver of Ms. Antoff's car and his possible familiarity with the Cahokia Police Department's photographic equipment, Officer Watson's identification of the defendant could have been unnecessarily influenced by the use of newer photographs 5 and 9 in the array and by the remark of Detective Sharp, after Watson could not decide between those pictures, that the suspect was shown in photograph 5. Under the parties' view of the reliability of Officer Watson's identification, then, we will disregard his testimony and focus on the remaining identification evidence presented at trial to determine whether the defendant was denied a fair trial by the introduction of that evidence.

■■ In order to demonstrate a violation of due process, a criminal defendant against whom evidence of pretrial identification procedures is presented at trial must show (1) that the procedures used were unnecessarily suggestive, and (2) that those procedures contributed to a substantial likelihood of misidentification. (*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375; *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *People v. Hamilton* (1977), 54 Ill. App. 3d 215, 369 N.E.2d 377.) In this case, it is claimed that the procedures through which Sandra Antoff identified the defendant before trial were defective on both of these grounds.

The defendant first asserts that the use of a photographic array was improper because he was in custody when the array was presented to Ms. Antoff, as well as to Officer Watson. He is correct in noting that the Illinois Supreme Court has expressed disfavor with the use of a photographic method of identification when a suspect is in custody and available for a lineup. (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634.) However, these statements of disapproval do not mean either that evidence of a photographic array is inadmissible if the defendant is in custody when the array is shown or that the propriety of a photographic array must be judged by different standards, depending on whether the defendant is in custody at the time the photographs are shown. Even when the defendant is in custody, it must still be demonstrated that the array was unnecessarily suggestive and that it led to a substantial likelihood of misidentification. *People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332; *People v. Mikel* (1979), 73 Ill. App. 3d 21, 391 N.E.2d 550; *People v. Meredith* (1976), 37 Ill. App. 3d 895, 347 N.E.2d 55.

Turning to the details of the photographic array, the defendant points to the following features which, he states, created a suggestive identification procedure: (1) As discussed earlier, seven of the nine photographs were older, and had different edges, than the other two. (2) The seven older photographs were taken against different backgrounds than those used in the new photographs. (3) The defendant's facial features and his longer hair distinguished him from the other eight subjects in the array, and, (4) the date on the defendant's photograph was visible, intimating that, since his picture was taken very recently, he was a suspect for the offense in question. To this last observation the People reply that all of the photographs were in plastic sleeves which were covered by a strip of masking tape to obscure the date, and the effectiveness of the tape in covering the date depended upon the position of the picture in the sleeve, which could be easily changed. We cannot find any evidence in the record to suggest that the date of the defendant's photograph, or any other in the array, was displayed to any witness, and without such testimony, we cannot presume that that irregularity occurred.

Thus, we are left with the discrepancies in age, shape and background of the photographs, and the difference in hair length and facial features between the defendant and the other individuals in the array. Parenthetically, we observe that the difference in backgrounds between the two newer pictures and the seven older ones is that the suspect's height is indicated in inches as well as in feet on the newer backgrounds. The People invite comparison of all of these distinguishing factors to those in other cases where the array was held to be not suggestive. For example, the defendant's photograph was noticeably darker than the rest

of the array in *People v. Summers* (1977), 49 Ill. App. 3d 70, 362 N.E.2d 1347, and in *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297, only the defendant's picture was in color. In *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68, the defendant's photograph was the only one in the array without any writing on it and without two views of its subject. The defendant's picture was larger than the rest in both *People v. Hart* (1973), 10 Ill. App. 3d 857, 295 N.E.2d 63, and *People v. Schmitt* (1981), 99 Ill. App. 3d 184, 424 N.E.2d 1267, and only the defendant's picture was dated in *Hart*, while the defendant's picture in *Schmitt* showed more of his torso than did the other snapshots. To this list of authority might be added *People v. Johnson* (1976), 43 Ill. App. 3d 649, 357 N.E.2d 151, where the defendant was the only individual depicted without a shirt, and *People v. Perkins* (1977), 47 Ill. App. 3d 548, 362 N.E.2d 109, in which the photographs of the co-defendants were not entirely dry when they were viewed by the victim, and were the only photographs with "irregular edges" in the group.

■■ We agree with the People that the photographic discrepancies between pictures 5 and 9 and the rest of the array are considerably less than the discrepancies mentioned in the cases in the preceding paragraph, and thus, according to the case law in Illinois, do not render the array suggestive to Ms. Antoff, who was not shown to have been familiar with the Cahokia Police Department's photographic equipment. Nor can we accept the defendant's claim that the array was unfair because his hair length and facial features differed from those of the other eight subjects. It is a truism that individual facial features and hair styles and lengths differ, and this makes precise correspondence of all subjects in a photo array a practical impossibility. Complete exactitude of features is not required in a photographic identification (*People v. Whitley* (1977), 49 Ill. App. 3d 493, 364 N.E.2d 511), and, upon examination of the nine photographs used in this case, we cannot say that the differences between the appearance of the defendant and those of the other eight men were so significant as to demonstrate that the array was suggestive.

■■ The defendant's sole challenge to the corporeal lineup procedure is that, while he was 27 years old at the time of the lineup, the other five participants ranged from 17 to 19 years in age. This distinguishing factor in a lineup might be considered suggestive under other circumstances, but we do not believe that this is so in this case. As the People note, an examination of defendant's lineup and array of photographs shows that in neither representation does he look any older than 20, and, as Ms. Antoff described her assailant as looking about 20 years old, this lineup was appropriate, if not demanded, in this case. To have placed the defendant alongside other individuals in their late twenties would have singled him out by virtue of his youthful appearance. As in the photographic array, the

defendant's appearance is not so dissimilar from the other participants to prove that the lineup could be considered suggestive.

■■ But, argues the defendant, even if the characteristics of both the lineup and the photo array did not make either procedure suggestive, the cumulative effect of all pretrial identification was so. This is especially true, he states, given that Detective Sharp told Ms. Antoff that a suspect (or two suspects) was represented in the photo array. Although there is no impropriety in informing a witness that suspects are in custody (*People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915; *People v. Carlton* (1979), 78 Ill. App. 3d 1098, 398 N.E.2d 107), it is preferable that the witness not be told that a suspect is included in a particular photo array or lineup. Nonetheless, we do not feel that Detective Sharp's comments introduced any impermissible element of suggestion into an otherwise fair identification procedure.

However, even if we assume that the procedures employed to obtain Ms. Antoff's identification of her assailant were impermissibly and unnecessarily suggestive, this does not necessarily mean that evidence of those procedures cannot be used at trial. If, under the well-known criteria in *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375, a witness' identification is "reliable," then the use of evidence of that identification does not violate due process. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *People v. Levine* (1981), 99 Ill. App. 3d 141, 426 N.E.2d 215.) The burden of proving reliability is upon the State. (*People v. Carlton* (1979), 78 Ill. App. 3d 1098, 398 N.E.2d 107.) Under the *Neil v. Biggers* factors, the State has discharged that burden in this case.

At the time of the robbery, Ms. Antoff was able to observe her assailant at extremely close range, and, although it was night, her observation was aided by a nearby streetlight and the dome light of her car. Her assailant remained nearby long enough to engage her in a conversation which was more involved than a simple exchange of greetings. Ms. Antoff, being the focus of the stranger's inquiries, had a strong motive to remember the man, despite the fact that she was not a trained observer such as a police officer. Her description of this individual to the police, while confined to the characteristics of height, weight and age, was reasonably accurate. Ms. Antoff thought that the defendant was 5'7" tall and weighed 140 pounds, which is quite close to his actual height of 5'8" and weight of 145 pounds. For reasons discussed above, her reference to the defendant's age as 20 is not an improper estimate of his appearance, and the lack of any testimony concerning her recollection of defendant's facial features does not seem to cast serious doubt on the reliability of her identification. As has been stated on other occasions, the process of identification is one in which the observer typically notices a general

impression of a person rather than specific features (*People v. Dandridge* (1981), 98 Ill. App. 3d 1021, 424 N.E.2d 1262; *People v. Mason* (1978), 61 Ill. App. 3d 918, 378 N.E.2d 384), and a lack of detail in a witness' description is particularly insignificant where, as here, the defendant has no abnormal or distinguishing features such as facial hair, scars or other marks. *People v. Hemphill* (1978), 62 Ill. App. 3d 977, 379 N.E.2d 1284.

During the pretrial identification, Ms. Antoff readily selected the defendant from the nine photographs and from the six men in the lineup. Indeed, so certain was her choice of the defendant's photograph that she felt it unnecessary to examine the rest of the array. And, finally, it should be recalled that Ms. Antoff was presented with the photographic array the day after the offense and viewed the lineup on the following day.

■■ All of these circumstances provide ample indication of the reliability of Ms. Antoff's identification, so that even if the lineup and photo array are considered to have been "suggestive," the defendant cannot complain of her testimony. In combination with the testimony of Tim Jones, which, for all its weaknesses, was unaffected by the pretrial identification procedures, Ms. Antoff's identification of the defendant is more than sufficient to support defendant's conviction, and thus the testimony of Officer Watson constituted, at most, harmless error. The pretrial identification procedures did not, then, act to deny the defendant due process. See *People v. Canity* (1981), 100 Ill. App. 3d 135, 426 N.E.2d 591.

Finally, the defendant asserts that the evidence introduced at trial was insufficient to prove him guilty of robbery, as opposed to theft. He does not dispute that a threat of force was applied to Ms. Antoff, but, it is stated, there must be a causal connection between that threat of force and the acquisition of property from the victim. To provide a factual illustration of this principle, the defendant directs our attention to *People v. Pack* (1976), 34 Ill. App. 3d 894, 341 N.E.2d 4, and *People v. King* (1979), 67 Ill. App. 3d 754, 384 N.E.2d 1013.

The brief statement of facts in *Pack* shows that the defendant entered the house of the victim, choked her until he thought she was dead, then took money from a purse on a nearby chair and fled. In *King*, the victim testified that she was awakened, in her bedroom, by a man who proceeded to rape her. That man then pulled the cord on the telephone in the victim's bedroom and told the victim not to move. After the victim called the police from another telephone, she discovered that her purse had been taken from the kitchen, which was between 15 and 30 feet away from the bedroom.

In both *Pack* and *King*, although force was used against the victims and property was taken from them, there was held to be no connection between the force and the taking of the property, and thus the evidence in neither case would support a conviction for robbery. (Compare *People v.*

*Minor* (1944), 388 Ill. 436, 58 N.E.2d 21.) The defendant claims that the evidentiary flaw present in *Pack* and *King* also exists in this case, because if the threat of force had been for the purpose of stealing the car, it would have succeeded when Ms. Antoff offered the car in return for her being released unharmed. The discussion of the facts of this case, above, indicated that the defendant refused this offer. From this refusal, it is contended that the defendant had an original intent to do something involving Ms. Antoff, and, when this plan was frustrated by her flight, the defendant, as an afterthought, took the car. Therefore, the defendant concludes, the threat of force applied to Ms. Antoff was not causally connected with the subsequent taking of the car.

■■ The defendant's argument is clever, but its logic is unsound. The fact that the defendant abandoned his plans concerning Ms. Antoff does not imply, as the defendant suggests, that the taking of the car arose only as a later alternative to those frustrated plans. Indeed, the evidence is forceful to the contrary, that whatever the defendant's goals were with respect to Ms. Antoff, he also intended to take her car at the time he threatened her with the use of force. As noted above, the defendant's conversation with Ms. Antoff was, from its inception, primarily concerned with the defendant's allegedly stolen car and with his request for a "ride." His remarks about the presence of keys in the ignition of his car, as they were in Ms. Antoff's car during the conversation, do not appear to have been merely coincidental. Moreover, as the People observe, there is no testimony to show that the defendant would have been satisfied solely with the abduction of Ms. Antoff. In fact, the defendant's insistence that she "move over" to the passenger's side of the car is additional proof that the defendant did not take the car merely as an afterthought.

The evidence introduced at trial establishes that the threat of force applied to Ms. Antoff was causally connected with the acquisition of her car by the defendant. For that reason, this case is factually distinguishable from *Pack* and *King*, and, accordingly, we affirm the judgment of the Circuit Court of St. Clair County.

Affirmed.

JONES and KASSERMAN, JJ., concur.